No. 2--05--1240                                        filed 4/13/06

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| In re MICHAEL M. and LITA M., Minors | ) | Appeal from the Circuit Court |
| | ) | of De Kalb County. |
| | ) | |
| | ) | Nos. 03--JA--37 |
| | ) | 03--JA--38 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee, v. Robyn M., | ) | Kurt P. Klein, |
| Respondent-Appellant). | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE GROMETER delivered the opinion of the court:

Following an evidentiary hearing, the circuit court of De Kalb County found respondent, Robyn M., to be an unfit parent under section 1(D)(p) of the Adoption Act (Act) (750 ILCS 50/1(D)(p) (West 2004)). The court subsequently found that it was in the best interests of respondent's minor children, Michael M. and Lita M., that respondent's parental rights be terminated. Respondent appeals, arguing that the trial court erred in finding that she was an unfit parent. We affirm.

Respondent and her husband, Michael M., Sr. (Mike), are the biological parents of Michael M. (Michael), born April 6, 1999, and Lita M., born November 14, 2002.[1] On

_____

[1] Mike voluntarily surrendered his parental rights on September 23, 2005, and he is not a party to this appeal.

January 9, 2004, Michael and Lita were adjudicated neglected pursuant to section 2--3(1)(b) of the Juvenile Court Act of 1987 (705 ILCS 405/2--3(1)(b) (West 2004)). Following a hearing, a dispositional order was entered on August 13, 2004, at which time the minors were made wards of the court, with the Department of Children and Family Services (DCFS) as their guardian. A permanency hearing was held on December 3, 2004, at which time the permanency goal was changed from return home to substitute care pending determination of termination of parental rights. On January 27, 2005, the State filed a separate petition for termination of parental rights as to each minor. As amended, the petitions alleged, inter alia, that respondent is "unable to discharge parental responsibilities due to mental illness, retardation, or developmental disability, under 750 ILCS 50/1(D)(p)." See 750 ILCS 50/1(D)(p) (West 2004). At the time of these proceedings, both children were in foster placement with a relative.

The evidence shows that on or about July 16, 2003, a hotline call was made to DCFS alleging that Michael and Lita were not being appropriately supervised or cared for. The caller reported that respondent ran out of formula for Lita and that she gave Lita juice instead for a period of several days. The caller also reported that respondent does not change the minors' diapers very often, Michael has rotten teeth, and Michael was found unattended on the street. The following day, Christine Gardner, a child-protection investigator with DCFS, visited respondent's home in Sandwich.

At the fitness phase of the proceedings, which was held on August 12, 2005, Gardner testified that she found the home "fairly clean" when she arrived and that Michael appeared to be healthy. However, Lita was dirty from crawling around on the floor and appeared to be small for her age. Respondent, who was wheelchair bound, told Gardner

that her husband had joined the carnival and had been absent from the home for several weeks. Some friends were assisting respondent, but she wanted them to leave. Respondent acknowledged that during a three-day span she was without any formula for Lita. As a result, she gave Lita juice. When Gardner asked respondent if she asked anyone to assist her in obtaining more formula, respondent answered that she had not.

Respondent's cousin, Angie Davis, was present for the visit. Davis told Gardner that at one point, she had prepared a feeding schedule and placed it on the refrigerator. However, the schedule was not present during Gardner's visit. In fact, respondent told Gardner that she fed Lita only when Lita acted like she was hungry. Respondent also told Gardner that she would give Michael a bottle with milk and sugar to help him sleep at night. Gardner observed that Michael was missing four teeth. Respondent indicated that the teeth had been pulled because of bottle rot. Moreover, respondent reported smoking marijuana and drinking alcoholic beverages in the home while the children were present. At the conclusion of the visit, Gardner transported the minors to the local hospital for examination.

Gardner spoke with Mike over the telephone on the day she visited the marital home. She then met with Mike a few days later. Mike admitted that he had once smoked crack cocaine in front of Michael. He also told Gardner that when he left the marital home, there was a feeding schedule on the refrigerator. When he returned to the home, however, the schedule was missing. Respondent told him that she did not use the schedule anymore.

As a result of her conversations with respondent and Mike, Gardner decided to "indicate" the report, based on inadequate supervision. Gardner noted that the children

had been diagnosed as malnourished and that Michael had run out into traffic on Route 34 on several occasions, requiring the police to return him to the home. Given respondent's physical disability and the fact that she needed assistance with her own care, Gardner did not believe that respondent could appropriately care for the children.

Dr. Nicholas O'Riordan, a licensed clinical psychologist, evaluated respondent in February 2005 at a nursing home in Elgin where respondent was staying at the time. Prior to conducting the evaluation, Dr. O'Riordan reviewed respondent's social history, spoke to respondent's caseworker, and examined respondent's medical and school records.

Respondent was aware of Dr. O'Riordan's visit, and she met him in the nursing home's lounge. Although respondent was confined to a wheelchair, Dr. O'Riordan stated that she used the wheelchair very effectively. For instance, Dr. O'Riordan reported that upon his arrival, he went to get a drink of water, and respondent "zipped off around the corner" in her wheelchair, as if she was playing a game with him.

Dr. O'Riordan discussed various topics with respondent, including her childhood, her illness, her relationship with her husband, the care of her children, and the future. Respondent reported a long history of abusing substances, moving around, and having marital problems. Dr. O'Riordan testified that respondent held contrary ideas regarding her relationship with her husband, whether she could care for the children, and whether she could care for herself. For instance, respondent praised Mike for taking care of her and she assumed that he would take care of her indefinitely. However, she also wanted to divorce him and date a man she met in the nursing home. With respect to Michael and Lita, respondent alternated between admitting that she had great difficulty in parenting the children and assuming that they would be coming home with her. Respondent reported

problems with her physical health, telling Dr. O'Riordan that she suffered from multiple sclerosis and that she had a brain tumor that would cause her death within five years. Respondent also acknowledged that she did need a lot of help to care for herself, and that, even while residing in the nursing home, she misses two out of three meals per day.

Dr. O'Riordan reported that respondent's speech was not always logical and fluent. She would frequently digress from the topic at hand, and he would have to bring her back on course. Dr. O'Riordan also noted that respondent's affect was bright even when talking about matters that were not cheerful. Dr. O'Riordan testified that such behavior is a diagnostic sign of a divorce between affect and thought. Dr. O'Riordan concluded, based on his clinical interview of respondent, that she was physically impaired and that she did not have a realistic view of how she would care for herself or for the children.

During his examination of respondent, Dr. O'Riordan administered or attempted to administer various tests. Dr. O'Riordan administered the Wechsler Adult IQ test to respondent. According to Dr. O'Riordan, respondent's IQ score of 54 indicated mild to moderate mental retardation. Dr. O'Riordan testified that a person with respondent's IQ would have a very limited understanding of the world around him or her and very limited ability to understand any complex ideas or simple, routine ideas, including taking care of oneself. In relation to the IQ test, Dr. O'Riordan reviewed an intellectual and academic assessment respondent completed in middle school. That assessment measured respondent's IQ in the 70s or the low 80s. Dr. O'Riordan described the variance between the results of the IQ test he administered and the results of the test administered to respondent in middle school to be indicative of "a dramatic drop, a catastrophic drop in

intellectual functioning." Dr. O'Riordan explained that people with IQs in the 70- or 80-point range can function on their own, but individuals scoring in the 50-point range cannot.

Dr. O'Riordan also administered a Bender-Gestalt test, a sentence-completion test, a Rorschach ink-blot test, a TAT test, and a Draw-A-Person test. The Bender-Gestalt test is a neurological screening assessment that involves copying figures. Dr. O'Riordan stated that people with severe neurological problems cannot perform the tasks on this test or can do so minimally. Respondent was able to perform very few tasks on that test. Dr. O'Riordan testified that he administered the sentence-completion test verbally because respondent could not write. The purpose of that test is to measure one's flow of thinking. Dr. O'Riordan testified that respondent's responses were contradictory, with many of the answers involving Mike. The Rorschach ink-blot test reflects one's ability to respond to something that is unclear or ambiguous. Respondent's responses to the graphics were very simple, typical of someone with a low IQ. The purpose of the TAT test, which involves examining pictures and developing stories about them, is to determine how an individual evaluates social situations. When respondent was administered the TAT test, she would describe only small parts of the picture, a characteristic indicative of someone with a low IQ score. Finally, respondent also attempted the Draw-A-Person test. During this exercise, respondent asked Dr. O'Riordan if she could include both her husband and a paramour in her family drawing.

Dr. O'Riordan evaluated respondent according to the five axes listed in the Diagnostic and Statistical Manual of Mental Disorders. As for axis one, Dr. O'Riordan classified respondent as a substance abuser in remission because she lacked access to drugs. He also considered the possibility of psychosis because of respondent's

contradictory responses and the fact that she mentioned hearing voices during the interview. As for axis two, Dr. O'Riordan diagnosed respondent with mild mental retardation. Dr. O'Riordan noted that although respondent was able to carry on a conversation, she had poor judgment. Dr. O'Riordan opined that respondent could not care for herself or the minors without the risk of neglect. Dr. O'Riordan did not believe that this condition was likely to improve in the future. To the contrary, Dr. O'Riordan believed that respondent's condition would deteriorate.

On cross-examination, Dr. O'Riordan stated that he examined respondent on only one occasion for a period of about three hours and that he did not have the opportunity to observe respondent interact with her children. Dr. O'Riordan acknowledged that there was nothing specific enough to diagnose a psychiatric disorder in a clear category, such as paranoid schizophrenia or bipolar disorder. In addition, he ruled out a personality disorder. Dr. O'Riordan also acknowledged that respondent did have pictures of the children in her room and that she spoke fondly of the minors. Dr. O'Riordan stressed that respondent's ability to care for the minors was not compromised due to willful neglect. Rather, it was due to her physical and mental condition.

Cathy Zeier, a regional supervisor with Catholic Charities, testified that Catholic Charities became involved with the case in October 2003. In October, November, and December 2003, a caseworker visited respondent's home about twice a month. The caseworker reported that the house was "filthy." The counters were sticky, the sink was overflowing with dishes, there was trash on the floor, and the house smelled of urine.

A client service plan was developed for respondent. The initial plan required respondent to complete a substance-abuse evaluation, maintain clean and independent

housing, undergo a mental-health assessment, complete a psychological evaluation, attend court dates, visit consistently with the children, and attend parenting classes. Zeier testified that respondent obtained a substance-abuse evaluation and that no follow-up treatment was recommended. However, the condition of respondent's home never improved. In February 2004, Mike was arrested. Respondent was unable to live independently, so she moved into her father's home. Respondent resided with her father until June 2004, when she moved to a nursing home in Aurora. Respondent moved out of that facility in December 2004.

When Catholic Charities became involved in this case, respondent exercised weekly visitation with the children. Initially, the visitation took place at respondent's home. However, when cleanliness concerns arose, the visits were moved to a McDonald's restaurant. Visitation was suspended after respondent moved in with her father, because there were concerns that he had active tuberculosis. Beginning in September 2004, visitation was offered once a month at the children's foster home. Respondent visited with the children in September, October, and November 2004. However, she cancelled her December 2004 visit, and the last time respondent visited the children was early in January 2005. She was offered visits after that, but she did not appear. According to Zeier, respondent has maintained erratic telephonic contact with Catholic Charities. Zeier testified that sometimes respondent will call once every three weeks while at other times she will call three times a day. In addition, Zeier testified that respondent completed the group portion of the parenting classes. She was asked to continue with one-on-one instruction, but that never took place because a home setting was needed but unavailable.

Respondent underwent a Daniel Memorial Assessment in August 2004. The purpose of this assessment is to gauge a person's independent living skills. Respondent scored an 18 out of 90 on the assessment, indicating serious deficits in independent living. Zeier stated that the assessment considers not only the ability to care for oneself, but also the ability to care for others. One of the questions on the assessment asks where the individual pictures herself in five years. Respondent answered that she pictured her children as grown and gone even though they were only two and five at the time.

On cross-examination, Zeier testified that she has observed respondent interact with her children. Zeier opined that although respondent requires prompting to interact with the children, she loves the minors very much. Following Zeier's testimony, the State rested.

Respondent testified on her own behalf. Respondent stated that she is 28 years old and that in June 2005, she moved into an apartment in Elgin, where she resides with her "fiancé." Respondent stated that she is unemployed and that it is difficult for her to find work, given her physical condition. Respondent testified that she is still married to Mike but that she has contacted an attorney about obtaining a divorce. Respondent also testified that she has two children, six-year-old Michael and two-year-old Lita. Although respondent could not recall the last time that she saw the minors, she testified that she loves them and that she does not want to give them up. Respondent acknowledged that it is difficult for her to clean up her house without help. Respondent recalled meeting with Dr. O'Riordan and completing tests for him. Respondent admitted that she has used drugs in the past, but stated that she quit prior to the initial visit by DCFS. Respondent denied having a drinking problem.

On cross-examination, respondent stated that she and her "fiancé," who is an epileptic, receive Supplemental Security Income sufficient to cover rent, utilities, and food costs. Respondent also reported that her "fiancé" helps her take care of the apartment. Respondent admitted that she has not tried to contact the children through either Catholic Charities or the relatives with whom the children were placed. Respondent acknowledged that one of the reasons that her children were taken out of her custody was that Michael was found alone on the street. When asked how she would react if that were to happen now, respondent stated that she would call someone to retrieve him.

Following closing arguments, the court concluded that the State had proved by clear and convincing evidence that respondent was unfit. In its ruling, the court emphasized Dr. O'Riordan's testimony, stating:

"I think Dr. O'Riordan was strong and the examples and the testing that he testified to and the interviews that he had with the mother clearly show[] that he diagnosed a mental illness, that he diagnosed a mental impairment. The other parts of his diagnoses I don't know are necessarily relevant to these proceedings, but I do find by clear and convincing evidence that the State through the testimony of Dr. O'Riordan established mental illness, mental impairment, and that will be my finding and we'll move on to the best interest portion of this matter."

At the best-interest phase, the trial court heard testimony from various witnesses regarding the status of the children and their foster placement. After considering this testimony, the court found by clear and convincing evidence that it was in the best interests of the children that respondent's parental rights be terminated. This appeal followed.

On appeal, respondent argues that the State failed to prove by clear and convincing evidence that she suffered from a mental impairment, mental illness, mental retardation, or developmental disability so as to warrant a finding of unfitness under section 1(D)(p) of the Act (750 ILCS 50/1(D)(p) (West 2004)). Therefore, respondent contends, the trial court's finding that she was unfit was against the manifest weight of the evidence. The State counters that the trial court's finding of unfitness was not against the manifest weight of the evidence because the State established that respondent was mentally ill and mentally impaired.

"The termination of parental rights is an extraordinary measure, given the superior rights of parents, against the rights of others, to raise their children." In re Cornica J., 351 Ill. App. 3d 557, 566 (2004). As a result, before the State may completely and irrevocably sever the rights of parents in their children, due process requires that the State support its allegations of unfitness by clear and convincing evidence. In re M.M., 303 Ill. App. 3d 559, 565 (1999). We will not reverse a decision of a trial court declaring a parent unfit unless the finding was against the manifest weight of the evidence. M.M., 303 Ill. App. 3d at 565.

We begin our discussion with the relevant statute itself. Section 1(D)(p) of the Act defines "unfitness" as follows:

"(p) [i]nability to discharge parental responsibilities supported by competent evidence from a psychiatrist, licensed clinical social worker, or clinical psychologist of mental impairment, mental illness or mental retardation as defined in Section 1-116 of the Mental Health and Developmental Disabilities Code, or developmental disability as defined in Section 1-106 of that Code, and there is sufficient justification

to believe that the inability to discharge parental responsibilities shall extend beyond a reasonable time period." 750 ILCS 50/1(D)(p) (West 2004).

Obviously, by separately referring to "mental illness," "mental impairment," "mental retardation," and "developmental disability," the legislature meant to distinguish the meanings of these terms. Section 1(D)(p) provides that the latter two terms shall have the meanings ascribed to them by the legislature in the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/1--100 et seq. (West 2004)). Section 1--116 of the Code (405 ILCS 5/1--116 (West 2004)) defines "mental retardation" as follows:

" 'Mental retardation' means significantly subaverage general intellectual functioning which exists concurrently with impairment in adaptive behavior and which originates before the age of 18 years." 405 ILCS 5/1--116 (West 2004).

Section 1--106 of the Code defines "developmental disability" to mean:

"a disability which is attributable to: (a) mental retardation, cerebral palsy, epilepsy or autism; or to (b) any other condition which results in impairment similar to that caused by mental retardation and which requires services similar to those required by mentally retarded persons. Such disability must originate before the age of 18 years, be expected to continue indefinitely, and constitute a substantial handicap." 405 ILCS 5/1--106 (West 2004).

The parties agree that the definitions of "mental retardation" and "developmental disability" require that these conditions originate prior to the age of 18. However, the parties dispute whether a finding of unfitness under section 1(D)(p) of the Act due to either "mental illness" or "mental impairment" also requires the disability to originate prior to the age of 18. This

issue presents a question of statutory interpretation, which we review de novo. People ex rel. Shockley v. Hoyle, 338 Ill. App. 3d 1046, 1050 (2003).

"The cardinal rule of statutory construction is to ascertain and give effect to the intent of the legislature." People v. Boand, 362 Ill. App. 3d 106, 139 (2005). The best indication of that intent is the plain language of the statute itself. In re Christopher K., 217 Ill. 2d 348, 364 (2005). We consider the statute in its entirety. Andrews v. Kowa Printing Corp., 217 Ill. 2d 101, 106 (2005). Where the language of the statute is clear and unambiguous, we will give effect to it without resorting to other aids of statutory construction. Christopher K., 217 Ill. 2d at 364. With these principles in mind, we examine the relevant statutory authority.

Section 1(D)(p) does not expressly define the terms "mental illness" and "mental impairment." Nor does section 1(D)(p) define these terms by reference to other statutory provisions as it does with the terms "mental retardation" and "developmental disability." See 750 ILCS 50/1(D)(p) (West 2004) (referring to sections 1--106 and 1--116 of the Code (see 405 ILCS 5/1--106, 1--116 (West 2004) (defining "developmental disability" and "mental retardation," respectively))). The Code, however, defines "mental illness" as follows:

> " 'Mental illness' means a mental, or emotional disorder that substantially impairs a person's thought, perception of reality, emotional process, judgment, behavior, or ability to cope with the ordinary demands of life, but does not include a developmental disability, dementia or Alzheimer's disease absent psychosis, a substance abuse disorder, or an abnormality manifested only by repeated criminal or otherwise antisocial conduct." 405 ILCS 5/1--129 (West 2004).

Nowhere in the plain language of this provision is there a requirement that the condition originate before the age of 18. Had the legislature intended to include the age requirement in this definition, it could have easily done so as it did with the terms "mental retardation" and "developmental disability." The legislature's express failure to include such language leads us to conclude that an age requirement was never intended.

The Code does not contain a definition of "mental impairment." However, the word "impairment" is defined as "[t]he fact or state of being damaged, weakened, or diminished." Black's Law Dictionary 754 (7th ed. 1999). This definition does not imply an age requirement, and we refuse to engraft one onto the statute where the legislature could have easily done so had it so intended. Moreover, in M.M., this court implicitly held that a finding of parental unfitness under section 1(D)(p) of the Act due to "mental impairment" does not require the condition to originate before the age of 18. M.M., 303 Ill. App. 3d at 567. Accordingly, we reject any contention that the terms "mental illness" and "mental impairment" as used in section 1(D)(p) of the Act contain a requirement that those conditions originate prior to the age of 18.

Having determined that the terms "mental illness" and "mental impairment" as used in section 1(D)(p) of the Act do not require the State to establish that these conditions originated before the age of 18, we turn to the principal argument on appeal, i.e., whether the finding of unfitness was against the manifest weight of the evidence. As noted above, the trial court found that the State proved by clear and convincing evidence that respondent was mentally ill and mentally impaired. Respondent contends that the State failed to prove by clear and convincing evidence that she was unfit under section 1(D)(p), because there was no evidence that she suffered from "mental retardation" or a "developmental disability"

either of which originated prior to the age of 18, as required by the definitions of these terms.  See 405 ILCS 5/1--106, 1--116 (West 2004).  Respondent also insists that the State did not present any evidence that she otherwise suffered a "mental illness" or "mental impairment."

In order to prove a parent unfit under section 1(D)(p), the State must (1) present competent evidence that the parent suffers from a mental impairment, mental illness, mental retardation, or developmental disability sufficient to prevent the discharge of normal parental responsibilities; and (2) present sufficient evidence to conclude that the inability will extend beyond a reasonable period of time.  M.M., 303 Ill. App. 3d at 566. Respondent's arguments focus exclusively on the first prong.  As noted above, we will not reverse the decision of a trial court declaring a parent unfit unless the finding was against the manifest weight of the evidence.  M.M., 303 Ill. App. 3d at 565.  "A decision is against the manifest weight of the evidence only where the opposite result is clearly evident or where the determination is unreasonable, arbitrary, and not based on the evidence presented."  Cornica J., 351 Ill. App. 3d at 566.

We agree with respondent that the State failed to establish that she suffered from mental retardation or a developmental disability either of which originated before the age of 18.  This court has suggested that the State is not required to present direct evidence regarding the age at which either of these conditions originated.  M.M., 303 Ill. App. 3d at 567.  In M.M., we determined that, in light of expert testimony regarding the respondent's low intelligence and personality problems, a reasonable trier of fact could have inferred that the respondent's mental condition existed prior to the age of 18.  M.M., 303 Ill. App. 3d at 567.  In this case, Dr. O'Riordan administered an IQ test to respondent.  According to  Dr.

O'Riordan, respondent's score of 54 indicated mild mental retardation. However, Dr. O'Riordan never stated when respondent's condition originated. Moreover, we do not find that the evidence presented by the State was sufficient to support an inference that respondent was mentally retarded or developmentally disabled by the time she turned 18. As part of his evaluation, Dr. O'Riordan reviewed an intellectual and academic assessment respondent completed in middle school. That assessment measured respondent's IQ in the 70s or the low 80s. Dr. O'Riordan explained that people with IQs in the 70- or 80-point range can function on their own, but individuals scoring in the 50-point range cannot. Although Dr. O'Riordan described the variance between the results of the IQ test he administered and the results of the test administered to respondent in middle school to be indicative of "a catastrophic drop in intellectual functioning," there is no indication when this drop took place. Presumably, respondent was between 11 and 13 years of age when she completed the IQ test she took in middle school. Respondent was in her upper 20s when Dr. O'Riordan evaluated her. Given the gap of almost 15 years between the two assessments, it would be presumptuous to infer that the drop occurred prior to the age of 18.

We also determine that the court's conclusion could not rest on a finding that respondent was mentally impaired. Our supreme court has held that a termination petition must contain an allegation that the parent is unfit as well as the specific statutory grounds for charging the parent with unfitness. In re D.C., 209 Ill. 2d 287, 295 (2004). Thus, a court may not terminate a parent's rights on grounds not charged in the petition. D.C., 209 Ill. 2d at 296. In this case, the State's petitions did cite to section 1(D)(p) of the Act (750 ILCS

50/1(D)(p) (West 2004)).  However, as we point out above, section 1(D)(p) lists four grounds of unfitness: mental impairment, mental illness, mental retardation, and developmental disability.  Although these four grounds coexist within the same paragraph, they are distinct, each requiring separate analysis.  See In re C.M., 305 Ill. App. 3d 154, 163-64 (1999) (discussing section 1(D)(m) of the Act (750 ILCS 50/1(D)(m) (West Supp. 1997)).  Here, the State listed only three of these four grounds in its petitions: mental retardation, mental illness, and developmental disability.  Nevertheless, the trial court held that the State established by clear and convincing evidence that respondent was mentally impaired.  The State's failure to allege that respondent was mentally impaired, however, renders improper that finding of the trial court.

To summarize, we have concluded that there was no basis for a finding that respondent was unfit based on mental retardation, developmental disability, or mental impairment.  The question remains, however, whether the trial court's finding that the State established that respondent was unfit due to mental illness was against the manifest weight of the evidence.  As we noted previously, section 1(D)(p) neither expressly defines "mental illness" nor refers to other statutory definitions of the phrase.  Nevertheless, we find instructive to our analysis the definition of "mental illness" as set forth in the Code and as identified earlier.  Judged by this definition, we cannot conclude that the trial court's finding that respondent was unfit due to mental illness was against the manifest weight of the evidence.

Notably, the evaluation of respondent by Dr. O'Riordan, a licensed clinical psychologist, indicated that respondent had an IQ of 54.  Although a low IQ does not

automatically translate into an inability to discharge parental responsibilities (Cornica J., 351 Ill. App. 3d at 569), Dr. O'Riordan stated that an individual with an IQ in the 50s would be unable to function on his or her own. Further, Dr. O'Riordan testified that respondent held contrary ideas regarding her relationship with her husband, whether she could care for the children, and whether she could care for herself. Dr. O'Riordan also reported that respondent's affect was bright even when talking about matters that were not cheerful, behavior that is indicative of a divorce between affect and thought. Dr. O'Riordan concluded not only that respondent was physically impaired, but also that she did not have a realistic view of how she would care for herself or for the children. Dr. O'Riordan believed that respondent's condition would deteriorate. Based on this testimony, and pursuant to the Code's definition of "mental illness" (see 405 ILCS 5/1--129 (West 2004)), the trial court could conclude that respondent suffered from a mental disorder that substantially diminished her thought, perception of reality, judgment, behavior, and ability to cope with the ordinary demands of life.

Respondent argues that the trial court's finding of mental illness was against the manifest weight of the evidence given that Dr. O'Riordan met with her on only one occasion for three hours and that he did not observe her interact with the children. In support of this contention, respondent cites Cornica J., 351 Ill. App. 3d 557. Respondent's reliance on Cornica J. is dubious given that each case concerning parental unfitness is sui generis. In re S.R., 326 Ill. App. 3d 356, 361 (2001). Besides, we do not agree that the fact that Dr. O'Riordan met respondent on only one occasion rules out a finding of unfitness. While we did mention that the expert in Cornica J. had only three short interactions with the respondent, we also noted

that some of the expert's findings were contradicted by testimony from the minor's grandparents. Cornica J., 351 Ill. App. 3d at 570. In this case, testimony from both Gardner, the DCFS investigator, and Zeier, the Catholic Charities representative, supported Dr. O'Riordan's conclusion. For instance, Gardner noted that respondent routinely rejected any assistance in caring for her children. She did not ask for help when she ran out of formula for Lita, she wanted the friends who were assisting her to leave, and she ignored the feeding schedule prepared by her cousin. Zeier administered a test to assess respondent's independent living skills. Respondent's score indicated a serious deficit in her ability to care for herself, let alone for others. Moreover, when respondent was asked as part of the test where she pictured herself in five years, she stated that she pictured her children as grown and gone even though they were only two and five at the time. In addition, we note that Dr. O'Riordan's evaluation was based on more than just an interview. He administered a battery of assessment tests, he reviewed respondent's social history, and he examined various medical and school records. Based on the totality of the evidence, we cannot say that a decision opposite to that reached by the trial court is clearly evident or that the trial court's decision was unreasonable, arbitrary, and not based on the evidence presented.

Accordingly, for the reasons set forth above, we affirm the judgment of the circuit court of De Kalb County terminating respondent's parental rights to Michael and Lita.

Affirmed.

McLAREN and HUTCHINSON, JJ., concur.