2022 IL App (4th) 220419

NOS. 4-22-0419, 4-22-0420 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 6, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* O.B. and E.R., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Peoria County |
| Petitioner-Appellee, | ) | Nos. 19JA412 |
| v. | ) | 20JA487 |
| Okittous B., | ) | |
| Respondent-Appellant). | ) | |
| | ) | Honorable |
| | ) | Derek G. Asbury, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court, with opinion.
Presiding Justice Knecht and Justice Turner concurred in the judgment and
opinion.

**OPINION**

¶ 1 Within days of their respective births in November 2019 and October 2020, the

State filed petitions for adjudication of neglect with respect to O.B. and E.R., the minor children

of respondent Okittous B. (Father) and Bridget R., who is now deceased and not a party to this

appeal. In due course, the trial court adjudicated the minors neglected, made them wards of the

court, and placed custody and guardianship with the Illinois Department of Children and Family

Services (DCFS). The State filed motions to terminate Father's parental rights to both children in

December 2021. Following a hearing on the State's motions in April 2022, the court found

respondent an "unfit person" within the meaning of section 1(D) of the Adoption Act (750 ILCS

50/1(D) (West 2020)). The court then found it was in the minors' best interests to terminate

respondent's parental rights.

¶ 2 In May 2022, respondent moved to consolidate the two cases into this one appeal, and we granted the motion. On appeal, respondent argues the trial court erred in terminating his parental rights; specifically, he alleges the trial court's unfitness finding stands against the manifest weight of the evidence because the State failed to provide competent evidence that he suffered a mental impairment or intellectual disability. We disagree.

¶ 3                                      I. BACKGROUND

¶ 4 On November 7, 2019, the State filed a petition for adjudication of neglect with respect to O.B. (born November 3, 2009), alleging her environment proved injurious to her welfare, in part, because of Father's criminal record and a 2010 incident where he left his nieces unsupervised. The State's October 6, 2020, petition for adjudication of neglect regarding E.R. (born October 2, 2020) contained the same allegations. After shelter care hearings, the trial court found probable cause existed that the minor children were neglected as alleged in the petitions. Finding immediate and urgent necessity based upon the neglect, the trial court placed temporary custody and guardianship of the children with DCFS.

¶ 5                                 A. Adjudicatory Proceedings

¶ 6 At the adjudicatory hearings (February 2020 and October 2020), Father stipulated to the petition's allegations and the trial court found factual bases for the stipulation. The trial court entered concomitant orders, adjudicating O.B. and E.R. neglected based on the contents of the State's petition, *i.e.*, Father's criminal record and history of leaving two young children unattended. In both matters, the trial court held the dispositional hearings immediately following the adjudication. The trial court's two dispositional orders both contained admonishments for Father to comply with recommended services and cooperate with DCFS or risk termination of

his parental rights. But while the order concerning O.B. found Father *unfit* to care for, protect, train, or discipline her due to the petition's allegations, the order regarding E.R. found Father *unable* to do so. Beyond instructing Father to complete the tasks assigned to him in the service plan, the trial court's order directed him to visit his children at the times and places set by DCFS and demonstrate appropriate parenting conduct.

¶ 7 The family service plan outlined recommended services for Father. Besides having to cooperate with DCFS, the plan required the following services: (1) identify supports in his life and utilize them when needed, especially when parenting O.B. and E.R.; (2) participate and complete individual counseling; (3) participate and complete a parenting course; (4) random monthly drug drops; (5) obtain and maintain stable, safe housing; and (6) maintain a legal source of income. As these matters proceeded through the juvenile court system, the record reflected when Father completed services. Over the course of time, Father obtained employment and moved to a house with his sister and her two children. He successfully completed the necessary parenting class in May 2020. He began individual counseling in June 2020, made moderate progress, and was discharged in December 2020.

¶ 8 On December 3, 2020, Father participated in a psychological evaluation with Dr. Richard A. Hutchison, Ph.D., a clinical psychologist, based upon DCFS's "concern about [Father's] ability to raise his child due to his 'cognitive functioning abilities and deficits in his ability to reason, plan, solve problems, think abstractly, comprehend complex ideas, learn quickly, and/or learn from experiences.' " Dr. Hutchison reviewed pertinent case records, interviewed Father, and administered various tests, including intelligence testing. Dr. Hutchison used the Stanford-Binet Intelligence Scales, Fifth Edition, to evaluate Father's intellectual functioning. Father scored the following: nonverbal intelligence quotient (IQ) 83; verbal IQ 78;

full-scale IQ 80. Dr. Hutchison interpreted Father's scores to indicate the following:

"[Father's] Nonverbal IQ is in the Low Average range. His Verbal IQ is in the Borderline range. His Full Scale IQ is at the bottom of the Low Average, top of the Borderline range. The difference between his IQ scores is not significant but would indicate that his Nonverbal abilities are somewhat more highly developed."

After all testing, Dr. Hutchison made no diagnoses, but he opined Father's "scores fit with his history of Special Education while in school" and "indicate that he would have difficulty learning and retaining new things." Dr. Hutchison went on to note Father's scores "indicate that his knowledge of the world and how it operates is quite limited" and "would tend to make parenting difficult as it would be a new thing with many things to learn and remember."

¶ 9        Following a May 26, 2021, permanency review hearing, the trial court ordered Father to undergo a parenting capacity assessment. Due the service provider's congested schedule, the assessment was delayed until November 2021. Jonna Tyler, LCPC, RPT-S, conducted the assessment and was tasked to answer several questions about Father's parenting capabilities, including, "What effect has [Father's] intellectual deficits had on his ability to parent his children?" Tyler's report recapped part of Dr. Hutchison's psychological evaluation of Father in December 2020, particularly, " '[Father's] verbal IQ is 78, in the borderline range of intellectual abilities. His non-verbal IQ is 83, in the low average range.' " Tyler further noted Dr. Hutchison's opinion that Father's scores indicated the above-referenced difficulties he would experience with parenting. As part of the parenting capacity assessment, Tyler interviewed the children's caseworker, who reported, "Dr. Hutchison's report identified [Father's] intellectual

- 4 -

disability as in the mild range." Tyler also interviewed Father, who reported he received special education services in school, but he noted he also attended "some mainstream classes." Tyler administered the Marschak Intervention Method (MIM), a test "designed to assess the quality and nature of the parent-child relationship." The MIM showed Father had weaknesses in the categories of structure, challenge, and nurturance. Father had limited awareness of when to attend to his children's needs. Tyler next administered the "Child Abuse Potential Inventory" on which Father obtained a low abuse score, though Tyler noted Father's elevated score on the lie scale invalidated those findings. Finally, Tyler observed the children's interactions with Father and with their foster parents. Ultimately, Tyler opined, "Father is not able to meet minimum parenting standards independently for [O.B.] and [E.R.] due to their complex medical needs. Tyler further stated: "It is this examiner's opinion that [Father's] intellectual deficits may impair his ability to manage the dietary needs and daily care needs of his daughters." She then opined: "[Father] does not have the capacity to care for the safety and security needs of his children or attend to the higher level of care they are in need of, due to their complex medical needs."

¶ 10                    B. Termination of Respondent's Parental Rights

¶ 11            On December 10, 2021, the State filed petitions seeking a finding of unfitness and termination of Father's parental rights to O.B. and E.R. The State alleged Father was an unfit person pursuant to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). The State's petition identified one ground of unfitness as to Father: "[He] is an unfit person as that term is defined in the Illinois Compiled Statutes, Chapter 750, Section 50/1 D(p), in that he is unable to discharge parental responsibilities supported by competent evidence from a psychiatrist or clinical psychologist of mental impairment, mental illness or mental retardation as defined in Section 1-116 of the Mental health and Development Disabilities Code, or developmental

disability as defined in Section 1-106 of that Code, and there is sufficient justification to believe that such inability to discharge parental responsibilities shall extend beyond a reasonable time period." See 750 ILCS 50/1(D)(p) (West 2020). The State further contended termination of Father's parental rights was in the children's best interests and asked for custody and guardianship to remain with DCFS, giving it the authority to consent to the minors' adoption.

¶ 12                                    C. Fitness

¶ 13        On April 25, 2022, the trial court held a fitness hearing. The State offered one exhibit, records of Father's parenting capacity assessment from the Antioch Group. Father's counsel objected on hearsay and foundational grounds, but the trial court admitted them over the objection, noting section 2-18(4)(a) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-18(4)(a) (West 2020)), provided that properly certified and delegated records are hearsay exceptions. The State called one witness, Tyler, who administered the parenting capacity assessment and authored the report. On direct examination, she testified she found Father "to not be capable or equipped to parent medically-complex children." Regarding Father's inabilities to meet his children's needs or interact appropriately with them, Tyler stated: "All these things point toward intellectual disability." She testified Father's abilities were unlikely to change in the near future.

¶ 14        On cross-examination by Father's counsel, Tyler testified Father could not complete services help him meet minimum parenting standards "[b]ecause his deficits appear to be due to an intellectual disability not due to not just having a service." Tyler opined it would be impossible for a person with an intellectual disability to become a fit parent, explaining: "You can't change the intellectual capacity of the brain. You can change through services teaching and training where there's deficits, but this was seen to be more than a deficit."

¶ 15	On examination by the trial court, Tyler testified to her professional

qualifications, noting she was a licensed clinical professional counselor (LCPC), a registered

play therapist supervisor, and child therapist. She noted she has performed countless parental

assessments over the past 15 years, probably averaging one per week with some exceptions for

holidays and summers.

¶ 16	Neither Father nor the guardian *ad litem* (GAL) presented any evidence.

¶ 17	Following brief arguments of counsel and the GAL, the trial court recessed to

review the parenting capacity assessment the State presented as "Exhibit One." When the parties

reconvened, the trial court issued its ruling from the bench. Noting the only evidence presented

included the one exhibit and Tyler's testimony, the trial court found Tyler credible. Though

neither the State nor the GAL made the request, the trial court noted it "probably would have

found [Tyler] to be an expert in the field of psychology," given her experience in administering

parenting capacity assessments. Based on the evidence, the court found Father's "verbal IQ was

a 78, which is in the borderline range of intellectual abilities." The trial court noted a

psychologist had referred Father to Tyler. The trial court then outlined the assessment and

Tyler's conclusions. It noted Father "underwent a full-scale psychological testing" and Tyler

suggested "that the court refer to and defer to Dr. Hutchinson's psychological report for more

information on this referral question." Reading from Tyler's report, the trial court observed:

"The psychological evaluation conducted by Dr. Hutchinson supports this examiner's concern

and observations regarding [Father's] cognitive limitations and how this limitation will impair

his ability to provide for the care of the children independently, particularly the children that

have complex medical needs." The trial court summed up its ruling by saying:

"So the court believes in this matter that it's really

unrefuted and overwhelming the State has by clear and convincing evidence established and proven up Count 1 of its petition to terminate parental rights in that [Father] is an unfit person as the term is defined in the Illinois Compiled Statutes, Chapter 750, Section 50/1(D)(p) [(750 ILCS 50/1(D)(p) (West 2020))] in that he is unable to discharge the parental responsibilities supported by competent evidence from a psychiatrist or clinical psychologist of mental impairment, mental illness, or mental retardation as defined in Section 1-116 of the Mental Health and Developmental Disabilities Code [(405 ILCS 5/1-116 (West 2020))].

There is sufficient justification to believe that such inability to discharge parental responsibility shall extend beyond the reasonable time period."

The trial court's written order noted, "[t]he petition is proved by clear and convincing evidence," but referred to the transcript for detailed findings.

¶ 18                                    D. Best-Interests Hearing

¶ 19         The trial court, with consent from the parties, immediately transitioned into a best-interests hearing. The State called Avery Gutwein, of Children's Home, who testified she had been the children's caseworker since fall 2020. Gutwein noted O.B. and E.R. lived in the same traditional foster home. She testified the foster parents provide for the children's needs for food, clothing, and shelter, as well as their educational and mental development. Similarly, the foster parents provided for the children's emotional needs, and the children look to the foster parents for safety and security. Gutwein testified the children share a strong bond with their

- 8 -

foster parents, explaining the parents show affection and attention to the kids. She noted O.B. and E.R. also share a bond with Father, but she opined their bond with the foster parents was stronger. Gutwein stated a doctor diagnosed both O.B. and E.R. with GLUT 1(Glucose Transport Type 1 Deficiency Syndrome), which requires specialized diets and seizure management. Gutwein testified the foster parents expressed their willingness to adopt O.B. and E.R.

¶ 20　　　　On cross-examination by Father's counsel, Gutwein testified O.B. and E.R. call their foster parents "momma" and "dada." She noted Father will hold the children during visits, but the children receive affection from the foster parents. On examination by the trial court, Gutwein testified both O.B. and E.R. had lived continuously with their foster parents since they were three days old. Neither Father nor the GAL presented evidence at this hearing.

¶ 21　　　　After brief closing arguments, the trial court rendered its decision on the record. Considering the statutory best-interests factors along with the evidence presented, the trial court found, "it is in the best interest of both minor children to terminate *** the parental rights of [Father]." The trial court noted O.B. and E.R. are "having all of their educational, medical, emotional, physical needs being met by the foster parents, even with the medical complexities they have as described by the caseworker since three days from their birth." Though Father was not present, the trial court read the appellate rights into the record and asked Father's counsel to make the appellate admonishment clear should Father choose to appeal.

¶ 22　　　　This appeal followed.

¶ 23　　　　　　　　　　　　　II. ANALYSIS

¶ 24　　　　Father argues the trial court erroneously terminated his parental rights; specifically, he contends the unfitness finding stands against the manifest weight of the evidence. We disagree and affirm the trial court's judgment.

¶ 25　　　　The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2020)) govern how the State may terminate parental rights. *In re D.F.*, 201 Ill. 2d 476, 494, 777 N.E.2d 930, 940 (2002). Together, the statutes outline two necessary steps the State must take before terminating a person's parental rights. The State must first show the parent is an "unfit person," and then it must show terminating parental rights serves the best interests of the child. *D.F.*, 201 Ill. 2d at 494-95 (citing the Adoption Act (750 ILCS 50/1(D) (West 1998)) and the Juvenile Court Act (705 ILCS 405/2-29(2) (West 1998))). Here, Father challenges the trial court's first-step decision only—the unfitness finding.

¶ 26　　　　" 'The State must prove parental unfitness by clear and convincing evidence ***.' " *In re A.L.*, 409 Ill. App. 3d 492, 500, 949 N.E.2d 1123, 1129 (2011) (quoting *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067, 808 N.E.2d 596, 604 (2004)). The Adoption Act provides several grounds on which a trial court may find a parent unfit, including the one the State alleged here:

> "Inability to discharge parental responsibilities supported by competent evidence from a psychiatrist, licensed clinical social worker [(LCSW)], or clinical psychologist of mental impairment, mental illness or an intellectual disability as defined in Section 1-116 of the Mental Health and Developmental Disabilities Code, or developmental disability as defined in Section 1-106 of that Code, and there is sufficient justification to believe that the inability to discharge parental responsibilities shall extend beyond a reasonable time period. However, this subdivision (p) shall not be construed so as to permit a [LCSW] to conduct any medical diagnosis to determine mental illness or mental impairment." 750 ILCS 50/1(D)(p) (West 2020).

¶ 27 When the State's termination petition alleges this unfitness ground it must make the threshold showing—by competent evidence from a psychiatrist, LCSW, or clinical psychologist—that the parent suffers a mental disability, namely a mental impairment, mental illness, intellectual disability, or developmental disability. *In re K.B.*, 2019 IL App (4th) 190496, ¶¶ 68, 70, 145 N.E.3d 661 (citing 750 ILCS 50/1(D)(p) (West 2016)). This court previously observed that "by separately referring to 'mental illness,' 'mental impairment,' '[intellectual disability],' and 'developmental disability,' the legislature meant to distinguish the meanings of these terms." *In re Michael M.*, 364 Ill. App. 3d 598, 606, 847 N.E.2d 911, 919 (2006). The terms are not synonymous, and ideally, the State's evidence should be tailored to the mental disability the petition alleges the parent suffers. Illinois's Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/1-100 *et seq.* (West 2020)) defines the terms "mental illness" (405 ILCS 5/1-129 (West 2020)), "intellectual disability" (405 ILCS 5/1-116 (West 2020)), and "developmental disability" (405 ILCS 5/1-106 (West 2020)). The Code does not define "mental impairment," but we have noted "the word 'impairment' is defined as '[t]he fact or state of being damaged, weakened, or diminished.' " *Michael M.*, 364 Ill. App. 3d at 608 (quoting Black's Law Dictionary 754 (7th ed. 1999)). The State's evidence must show the parent's disability meets the applicable definition of the ailment alleged. Here the State's petition listed all four types of statutory mental disabilities, even though it had to provide competent evidence of any one of those disabilities.

¶ 28 Once the State establishes a mental disability through competent evidence, it must then prove: "(1) the mental [disability] makes the parent unable to discharge his or her parental responsibilities and (2) such inability will persist for an unreasonably long time." *K.B.*, 2019 IL App (4th) 190496, ¶ 67 (citing 750 ILCS 50/1(D)(p) (West 2016)). The evidence necessary to

make these two showings need not come from a psychiatrist, LCSW, or clinical psychologist, but can come from less qualified mental health professionals or even "from common knowledge and experience." *K.B.*, 2019 IL App (4th) 190496, ¶ 70.

¶ 29    This court pays " 'great deference' " to a trial court's fitness finding " 'because of [that court's] superior opportunity to observe the witnesses and evaluate their credibility.' " *A.L.*, 409 Ill. App. 3d at 500 (quoting *Jordan V.*, 347 Ill. App. 3d at 1067). We "will not reverse a trial court's fitness finding unless it was contrary to the manifest weight of the evidence, meaning that the opposite conclusion is clearly evident from a review of the record." *A.L.*, 409 Ill. App. 3d at 500. Since " ' "[e]ach case concerning parental unfitness is *sui generis*, requiring a close analysis of its individual facts" ' " (*In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 19, 980 N.E.2d 91 (quoting *In re Konstantinos H.*, 387 Ill. App. 3d 192, 203, 899 N.E.2d 549, 558 (2008), quoting *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064, 859 N.E.2d 123, 135 (2006))), we now turn our attention to the facts of this case.

¶ 30    Here, the State presented competent evidence from a clinical psychologist (Dr. Hutchison), albeit through Tyler's report, that Father had a verbal IQ of 78, which placed him "in the borderline range of intellectual abilities," and a "non-verbal IQ [of] 83, in the low average range." Tyler, who is not a competent source per subsection 1(D)(p) (*i.e.*, a psychiatrist, clinical psychologist, or LCSW) but whose report contained admissible hearsay from a competent source (see *In re M.S.*, 210 Ill. App. 3d 1085, 1095-96, 569 N.E.2d 1282, 1288 (1991) (medical records of parent created as direct result of ongoing juvenile proceeding which relate to condition also directly related to proceeding satisfies statutory requirement of "relating to a minor" under section 2-18(4)(a) of the Juvenile Court Act (Ill. Rev. Stat. 1989, ch. 37, ¶ 802-18(4)(a)))), quoted the following from Dr. Hutchison's report, describing Father:

"His weakest are[a] was in general knowledge and the next to lowest was working memory. Academic screening has his ability to comprehend reading sentences in the borderline range at a grade equivalent of 6.5. His math ability was in the low average range at the grade equivalent of 6.1. These scores fit his history of special education while in school. This would indicate that his knowledge of the world and of how it operates is quite limited. It also would indicate that he has difficulty learning and retaining new things. This would tend to make parenting difficulty as it would be a new thing with many things to learn and remember. His ability to generalize and think abstractly is limited. Therefore learning something in the situation may be difficult to apply in a similar, but different situation."

Since she was not qualified to testify to Father's mental disability, Tyler deftly testified that based on her observations Father's parenting, "deficits appear to be due to an intellectual disability."

¶ 31　　　　The trial court found Tyler credible. But since its written order contained no detailed findings, we rely on the trial court's oral ruling, which found the State proved by clear and convincing evidence that Father was "an unfit person *** in that he is unable to discharge the parental responsibilities supported by competent evidence from a psychiatrist or clinical psychologist of mental impairment, mental illness, or [intellectual disability] as defined in Section 1-116 of the [Code]." Though the State seemed to rely on intellectual disability as the threshold showing for this unfitness ground, especially considering Tyler's report and testimony,

we conclude the State's evidence, however, did not clearly and convincingly establish Father suffered an intellectual disability according to the statutory definition. Section 1-116 of the Code defines "Intellectual disability" as "significantly subaverage general intellectual functioning which exists concurrently with impairment in adaptive behavior and which originates before the age of 18 years." 405 ILCS 5/1-116 (West 2020). Courts have "previously described '[intellectual disability]' as 'requiring an IQ of less than 70' and even 'less than 75.' " *People v. Wilson*, 2020 IL App (1st) 162430, ¶ 48, 170 N.E.3d 83 (quoting *In re S.W.N.*, 2016 IL App (3d) 160080, ¶ 73, 58 N.E.3d 877, citing *People v. Jones*, 2014 IL App (1st) 120927, ¶ 59, 8 N.E.3d 470, and *People v. Daniels*, 391 Ill. App. 3d 750, 754, 908 N.E.2d 1104, 1108 (2009)). Heeding the statutory definition for "intellectual disability" alongside the case law interpreting and applying it, we observe Father's IQ scores do not indicate he suffered "*significantly* subaverage general intellectual functioning." (Emphasis added.) 405 ILCS 5/1-116 (West 2020). Regarding proof of intellectual disability, the evidence was sparse. Tyler's report quoted Dr. Hutchison's report documenting Father's nonverbal IQ (78) was borderline and his verbal IQ (83) was low-average. Tyler's report also quoted Dr. Hutchison's observations that Father's scores placed him at a sixth-grade level for reading and math. Tyler quoted Dr. Hutchison's opinions that Father's knowledge was "quite limited," and his scores "tend to make parenting difficult" because he would have to learn and retain new information. But without the benefit of competent testimony from a clinical psychologist, like Dr. Hutchison, explaining Father's deficiencies *vis-à-vis* the statutory definition for intellectual disability, no court could conclude Father showed significantly subaverage general intellectual functioning. Rather, the court is left to compare scores. Since Father's scores do not fall to 75 or 70, we do not find the State clearly and convincingly proved Father suffered an intellectual disability by competent evidence.

¶ 32    This leaves either "mental impairment" or "mental illness" for the requisite mental disability necessary for this allegation of unfitness. "Mental impairment" is not defined by statute, but this court has used the definition from Black's Law Dictionary for "impairment" as " '[t]he fact or state of being damaged, weakened, or diminished.' " *Michael M.*, 364 Ill. App. 3d at 608 (quoting Black's Law Dictionary 754 (7th ed. 1999)). Based on this broader guideline—a damaged, weakened, or diminished mental state—we conclude the State met its burden for "mental impairment." Through Dr. Hutchison's findings, the State provided evidence that Father's "knowledge of the world and of how it operates is quite limited." Father's borderline and low-average IQ scores "indicate that he has difficulty learning and retaining new things" and "would tend to make parenting difficult as it would be a new thing with many things to learn and remember." Even based on this limited information from Dr. Hutchison that was quoted in Tyler's report, we conclude a reasonable fact finder could have determined Father suffered a mental impairment. Therefore, the State made the requisite threshold showing for a mental disability by competent evidence from clinical psychologist under section 1(D)(p), and we need not address the "mental illness" allegation. We move on to consider if the State satisfied the next two necessary showings: (1) whether Father's mental impairment renders him unable to discharge his parental responsibilities and (2) whether Father's inability to parent will persist for an unreasonably long time. We take each in turn.

¶ 33    Tyler's report detailed O.B. and E.R.'s complex needs. She noted both girls had been diagnosed with GLUT 1, a disorder that can cause glucose deficiencies in the brain and result in seizures. Tyler's report noted O.B. and E.R. "require a strictly managed special diet, daily medication, and close supervision due to their seizures." Tyler noted how the children's caseworker opined "that [Father] is not capable of meeting the children's daily care needs, given

the dietary needs and medical care, and appointments required for their current medical condition."

¶ 34    Tyler's own observation and evaluation of Father mirrored the caseworker's view. Tyler noted that while she was observing Father interact with his children, O.B. began having seizures and Father did not notice until Tyler told him. Tyler observed Father had limited eye contact and physical touch with O.B. and E.R. When he cared for O.B. and E.R. at the same time, he "appeared to have difficulty noticing and keeping track of both of his girls." Tyler explained Father "appeared able to attend to one child's needs and able to observe one child, however, he had difficulty noticing the child's needs when he was not directly focused on that child, in keeping track of what they were getting into or what they were doing with this examiner's assistance." Though she described Father as "kind and gentle in his approach to his children," Tyler noted Father needed assistance or direction to meet the children's caregiving needs, like feeding and changing diapers. After interviewing Father, observing him with his children, and administering him various tests, Tyler concluded Father "is not able to meet minimum parenting standards independently for [O.B.] and [E.R.] due to their complex medical needs." Tyler testified in accordance with her report, saying Father's diminished mental capacity rendered him "not *** capable or equipped to parent medically-complex children."

¶ 35    Tyler also testified Father's inability to parent O.B. and E.R. would continue for an unreasonably long time. She noted Father's capabilities were unlikely to change in the near future. She opined Father would not be able to learn (or be taught) because of his deficits. The trial court found Tyler credible, and we pay that determination " 'great deference' ". See *A.L.*, 409 Ill. App. 3d at 500 (quoting *Jordan V.*, 347 Ill. App. 3d at 1067). Through Tyler's testimony and report, the State clearly and convincingly established Father's inability to discharge his

parental responsibilities and further established his inability would persist for an unreasonably long time. See *K.B.*, 2019 IL App (4th) 190496, ¶ 70.

¶ 36 We find certain aspects of this case troubling, namely the State relying solely on Tyler's report and testimony (and the admissible hearsay statements therein as competent evidence) rather than admitting Dr. Hutchison's report or calling him to testify. But sometimes cases are decided by the standard of review. Based on this evidence, not matter how slight, the State proved with competent evidence from a psychologist that Father suffered a mental impairment, and it then proved Father's mental impairment rendered him unable to parent O.B. and E.R. and he would remain unable to discharge his parenting responsibilities in the near future. Accordingly, we cannot conclude the trial court erred in finding Father unfit and terminating his parental rights. The trial court's conclusion does not stand against the manifest weight of the evidence. See *A.L.*, 409 Ill. App. 3d at 500.

¶ 37                                III. CODA

¶ 38 It bears noting the special concurrence in *In re I.W.*, 2018 IL App (4th) 170656, ¶ 60, 115 N.E.3d 955 (DeArmond, J., specially concurring), where, like here:

> "This case began with a clear understanding by all parties involved regarding the parents' developmental and/or cognitive delays. Trial courts and the State should pay special attention to these cases to ensure the Department of Children and Family Services (DCFS) has made reasonable accommodations in providing services to aid parents in family reunification, as the Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. §§ 12101 to 12213 (2012)) and section 504 of the Rehabilitation Act of 1973 (section 504) (29 U.S.C. §§ 701 to 794 (2012)) demand, which simply was not done in this case."

¶ 39       Although the record is replete with references to Father's cognitive limitations, and even referenced how he would probably need accommodations, there is no indication they were provided. Quoting again from *I.W.*, 2018 IL App (4th) 170656, ¶¶ 89-91 (DeArmond, J., specially concurring):

> "Title II of the ADA (Title II) provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by such entity.' 42 U.S.C. § 12132 (2012). A child-welfare agency or trial court may not engage in any practice or administration of a program in such a way as to 'have the effect of discriminating on the basis of disability, or that [has] the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the child welfare agency's or court's program for persons with disabilities.' U.S. Dep't Health & Human Servs. & U.S. Dep't Justice, Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts Under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act (Aug. 2015), https://www.ada.gov/doj_hhs_ta/child_welfare_ta.html.

> As that publication notes, individuals with disabilities must be provided with opportunities to benefit from participation in

'child welfare programs, services, and activities that are equal to those extended to individuals without disabilities,' as well as the necessary 'aids, benefits, and services different from those provided to other parents and prospective parents where necessary to ensure an equal opportunity to obtain the same result or gain the same benefit, such as family reunification.' *Id.* '[S]ervices must be adapted to meet the needs of a parent or prospective parent who has a disability in order to provide meaningful and equal access to the benefit.' *Id.*; see also 28 C.F.R. § 35.130(b)(1)(ii)-(iv) (2015).

Title II requires child-welfare agencies to make all reasonably necessary modifications to programs or activities to allow disabled participants to fully engage, furnish auxiliary aids and services where necessary to ensure effective communication, administer services in the most integrated setting appropriate to the needs of the disabled participant, and provide, as needed, services or advantages beyond those required by regulation to people with disabilities. Nat'l Council on Disability, *Ch. 5: The Welfare System: Removal, Reunification, and Termination*, Rocking the Cradle: Ensuring the Rights of Parents with Disabilities and Their Children, https://ncd.gov/publications/2012/Sept272012/Ch5 (last visited Jan. 22, 2018)."

¶ 40    Now, 10 years after that groundbreaking report, we find DCFS and the courts continue to proceed to termination of parental rights for parents with disabilities with no

- 19 -

indication in the record of proceedings that appropriate accommodations were ever sought or made before concluding the parent is unfit. Further, just as in *I.W.*, this failure remained unquestioned before the trial court. It may be true the father in this case was incapable and, even with proper accommodations, would remain incapable of adequately parenting medically challenging children, but he is entitled to programs and services through DCFS which accommodate his particular limitations first, before reaching that conclusion.

¶ 41                                    IV. CONCLUSION

¶ 42          For the reasons stated, we affirm the trial court's judgment.

¶ 43          Affirmed.

*In re O.B.*, 2022 IL App (4th) 220419

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Peoria County, Nos. 19-JA-412, 20-JA-487; the Hon. Derek G. Asbury, Judge, presiding. |
| **Attorneys for Appellant:** | Dana M. Kelly, of Peoria, for appellant. |
| **Attorneys for Appellee:** | Jodi M. Hoos, State's Attorney, of Peoria (Patrick Delfino and Rosario David Escalera Jr., of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |