NOTICE

Decision filed 08/23/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 230230-U

NOS. 5-23-0230, 5-23-0231, 5-23-0232,

5-23-0233 cons.

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* MASON P., ANTHONY P., ATHENA P., and CHRISTINA W., Minors | ) ) ) | Appeal from the Circuit Court of Marion County. |
| (The People of the State of Illinois, | ) ) | |
| Petitioner-Appellee, | ) ) | Nos. 21-JA-105, 21-JA-106, 21-JA-107, 21-JA-108 |
| v. | ) ) ) | |
| Nell W., | ) ) | Honorable Ericka A. Sanders, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE BOIE delivered the judgment of the court.
Justices Moore and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*: Where evidence amply supported the circuit court's conclusions that respondent was an unfit parent and that her children's best interests required terminating her parental rights, and any argument to the contrary would lack merit, we grant respondent's appointed appellate counsel leave to withdraw and affirm the circuit court's judgment.

¶ 2    Respondent, Nell W., appeals the circuit court's orders finding her to be an unfit parent and terminating her parental rights to her four children, Mason P., Anthony P., Athena P., and Christina W. Her appointed appellate counsel concludes that there is no reasonably meritorious argument that the court erred in either respect. Accordingly, counsel has filed a motion to

1

withdraw as counsel. See *Anders v. California*, 386 U.S. 738 (1967). Counsel has notified respondent of counsel's motion and this court has provided respondent with ample opportunity to respond. However, respondent has not done so. After considering the record on appeal and counsel's motion, we agree that this appeal presents no arguably meritorious issues. Thus, we grant counsel leave to withdraw and affirm the circuit court's judgment.

¶ 3                                    BACKGROUND

¶ 4     The State, on November 17, 2021, filed petitions for adjudication of wardship for all four minors. The petitions alleged that the minors were neglected because their father, with whom they lived, had been arrested on child pornography charges; respondent had not visited the children; and the father's home was in "deplorable" condition with inadequate food.

¶ 5     The court conducted a shelter care hearing the same day. There, Tiffany Kelley, an investigator with the Department of Children and Family Services (DCFS), testified that the children's father had been arrested. When police arrived at his home, they found it "disgusting." There were clothes piled up, food all over the floor, and animal feces. Kelley took protective custody of the girls at their school and of the boys from a relative's home where they were in quarantine, as Mason had tested positive for COVID.

¶ 6     The girls had poor hygiene. They reported that their home was a "little messy" and that their clothes needed to be washed. A detective described the condition of the house as "horrendous" and that the smell was so bad that one detective almost vomited. It was described by one officer as "not livable."

¶ 7     Kelley eventually contacted both parents. She interviewed the father at the jail. He conceded the house was "messy," blaming the girls for failing to keep it clean. Respondent acknowledged that she had not seen her children in a "while." Kelley placed the boys with their

2

paternal aunt, where they usually lived, and the girls with a maternal aunt. A younger sibling, Trinity, was already in the care of the same aunt.

¶ 8    The court found an urgent and immediate necessity to take all four children into care. Accordingly, it granted DCFS temporary custody.

¶ 9    Respondent did not attend a subsequent status hearing and did not request visitation with the children. An initial service plan was established in January 2022. At some point, the court ordered that respondent have no contact with the children without prior approval.

¶ 10    The supervising agency, Caritas Family Solutions, recommended that, due to respondent's developmental delays, she should not be a caretaker for the children. She had not been involved in the children's lives for more than two years and had not requested visits. The girls refused to have contact with her, while the boys, who referred to her as "Becky," did not remember her as their mother.

¶ 11    An integrated assessment report recounted that respondent had previously been "indicated" for sexual penetration of a 1-year-old boy when she was 16. In 2012 and 2014, she was indicated for environmental neglect and later in 2014 was indicated for inadequate supervision. In 2016, she was indicated for inadequate supervision and environmental neglect and, later in 2016, was indicated for causing a substantial risk of physical injury and providing an injurious environment.

¶ 12    The report showed that respondent's mother died when she was five. Her father thereafter raised four children alone and respondent had to help care for her younger siblings. Her father was later imprisoned on sexual assault charges and died in prison in 2020. Respondent had been in foster care in 1987, 1991, 1994, and 2004.

¶ 13    Respondent graduated from high school but received special education services throughout. She had the intellectual functioning of a third grader. She had been involved with the

3

father of the children in this case for 10 years. After the children were returned to the father in 2019, respondent had not seen them again. At the time of the report, she was involved with Victor Long, whose own children were in foster care.

¶ 14 An amended petition for adjudication alleged that the boys were neglected in that the parents had failed to support them, and the girls lived in squalor in their father's home. At a dispositional hearing, both parents agreed that it was in the children's best interests to be made wards of the court. At an October 26, 2022, permanency hearing, the court changed the goal to substitute care pending termination of parental rights.

¶ 15 A report prepared by clinical psychologist Marilyn Marks Frey found that respondent had "Intellectual Disability/Mild and Generalized Anxiety Disorder." It was doubtful that respondent could protect her children due to her cognitive limitations. Although she had had minimal contact with the children, she appeared sincere in wishing to be a part of their lives. But the risks to the children, if returned to her, were significant due to her cognitive issues, which impacted her decision-making. If the children were to be returned to her, visits would need to happen slowly and be supervised. Moreover, the children's needs would need to be considered, given their minimal contact with respondent.

¶ 16 The State filed a petition to terminate respondent's parental rights, alleging that she had (1) failed to maintain a reasonable degree of interest, concern, or responsibility for the minors' welfare; (2) deserted the children for more than three months; (3) evidenced her intent to forego her parental rights; (4) abandoned the children; and (5) an inability to discharge her parental responsibilities as evidenced by competent evidence from a psychiatrist, licensed clinical social worker, or clinical psychologist. On January 11, 2023, the minors' father signed consents for adoption for each child.

4

¶ 17   A report filed in anticipation of the fitness hearing showed that respondent had attended four therapy sessions but had not attended for about three months and was in danger of being discharged. The caseworker had been unable to contact her.

¶ 18   At the fitness hearing, Frey was accepted as an expert in clinical psychology. She testified that respondent's full-scale IQ was 68. Respondent's scores on different parts of the test varied widely. In particular, she could read and comprehend only at a second-grade level. She lacked "executive functioning," which meant that she would have difficulty learning new material and applying it to subsequent tasks. Respondent's cognitive deficiencies could not be corrected.

¶ 19   In Frey's opinion, respondent did not have sufficient judgment to make decisions about relationships that were in the children's best interests even though she might want to do so. Additionally, it would be difficult for her to bond with the children, given the lengthy period during which she had not seen them. There was no reason to think that her inability to discharge her parental responsibilities could be resolved in a reasonable period of time.

¶ 20   Kelsey King testified that she was respondent's caseworker from the inception of the case. She had no contact with respondent for the first two or three months. Respondent had never attempted to contact the children or requested to see them. She sometimes mentioned having gifts for the children, but she never gave them to the children or asked King to do so. The no-contact order was not entered until February 1, 2022, so respondent could have seen the children prior to that.

¶ 21   The court ruled that the State had proven respondent unfit as a result of her cognitive disabilities which caused her to be unable to discharge her parental duties. That situation was unlikely to change in the near future. The court further found that respondent had abandoned the

children, as evidenced by her failure to see them for at least two years, and that she had not shown any interest, concern, or responsibility for them.

¶ 22    A March 15, 2023, report showed the following. Christina W. was 15 years old and was doing well socially, participating in sports, and attending church. She loved animals. Athena P. was 12. She resided in the same home as Christina W., with a maternal aunt. Athena was shy but participated in softball and church and enjoyed doing art projects. Both Christina and Athena referred to their foster mother as "mom" and wanted her to adopt them.

¶ 23    Mason P., age 10, lived with a paternal aunt, in the same home in which he resided prior to coming into care. He only visited with his father occasionally. He considered his aunt and uncle his parents and wanted them to adopt him. Anthony P., age nine, also lived with his paternal aunt, and had for most of his life. He did not remember his mother, and rarely visited with his father. He too wished to be adopted by his aunt and uncle. Both boys were in special education classes. Both participated in 4-H.

¶ 24    At the best-interests hearing, Katherine W., the girls' foster mother and aunt, testified that they had been placed with her for 2½ years 6 years ago, and again for the 2 years prior to her testimony. Katherine's biological children lived in her home, as did the girls' younger sister. The girls were sharing a room until a home remodeling project was completed that would allow each girl to have her own room. Katherine described Christina as very compatible with her, as they both talk a lot. She helped with the younger children, and was a "mother hen" type, even though that was not her responsibility. Christina took Focalin for ADHD.

¶ 25    Athena was the "quiet sister" but was starting to open up more. Both girls had developmental delays that were being addressed through individual educations plans (IEPs). The

6

girls generally got along with the other children in the home. Katherine planned to adopt the girls if respondent's rights were terminated.

¶ 26 Toni W. testified that she was the boys' foster mother and aunt. They had lived with her most of their lives. Toni and her husband were licensed foster parents. Her two older sons also resided with them. Mason and Anthony shared a bedroom, and her two other sons shared a second bedroom. Both Mason and Anthony had some special needs, which were mostly due to developmental delays. She and her husband loved the boys like their own and they were bonded to each other and the other children in the home.

¶ 27 King testified that she had been in both foster homes monthly since the case started. The children were very comfortable in their respective homes. Each family addressed the children's medical needs.

¶ 28 The court found it in the children's best interests to terminate respondent's parental rights and grant custody to DCFS with the authority to consent to their adoption. Respondent timely appealed.

¶ 29                                  ANALYSIS

¶ 30 Respondent's appointed appellate counsel concludes that the evidence overwhelmingly supported the circuit court's decisions to find respondent unfit and terminate her parental rights. We agree.

¶ 31 A proceeding to terminate parental rights occurs in two stages. *In re C.W.*, 199 Ill. 2d 198, 210 (2002). First, the State must prove, by clear and convincing evidence, that the parent is "unfit to have a child" under one or more of the grounds in the Adoption Act. *In re D.T.*, 212 Ill. 2d 347, 352 (2004); see 750 ILCS 50/1(D) (West 2020). Each statutory ground is independent so that if

7

one is established, the court's finding of unfitness can be affirmed. *In re Veronica J.*, 371 Ill. App. 3d 822, 828 (2007).

¶ 32 Here, the court found that respondent was unable to fulfill her parental duties because of cognitive deficits, that she abandoned the children, and that she had failed to show a reasonable degree of interest, concern, or responsibility for them. Section 1(D)(a) of the Adoption Act provides that a parent may be found unfit for abandoning her child. 750 ILCS 50/1(D)(a) (West 2020). Abandonment requires the intent to forego parental duties and relinquish all parental rights. *In re Adoption of D.A.*, 222 Ill. App. 3d 73, 78 (1991).

¶ 33 The evidence at the hearing was undisputed that respondent had not seen her children for more than two years before they came into care. King testified that, when the case opened, she first had to locate respondent, which took approximately two months. Respondent had not attempted to contact the children the entire time King was the caseworker and never formally requested visitation. The children reported to King they had seen their mother drive by their foster home, but she had not stopped to talk to them. King was unaware of any attempts by respondent to call the children since they came into care. Although she occasionally mentioned having gifts for the children, she apparently never gave them to the children or asked King to do so. Thus, the court could find that respondent abandoned the children as evidenced by a failure to see them for more than two years.

¶ 34 The court also found that respondent failed to show a reasonable degree of interest, care, or concern for the children. See 750 ILCS 50/1(D)(b) (West 2020). In deciding whether the evidence supports such a finding the "court is to examine the parent's efforts to communicate with and show interest in the child, not the success of those efforts." *In re Adoption of Syck*, 138 Ill. 2d

8

255, 279 (1990). The court must place the parent's efforts in the context of the circumstances in which their conduct occurred. *Id.* at 278.

¶ 35 King's testimony also supports the court's finding on the second issue. She said that respondent failed to provide any financial support for the children but claimed to have gifts for the children that she never gave them. Prior to the entry of the no-contact order, respondent was allowed to call the children, but she never did. No evidence was presented that respondent ever asked the caseworker, or the foster parents, about the children's health, education, or other life circumstances, other than a passing comment to King that she would like to see them.

¶ 36 Finally, Frey's testimony supports the finding that respondent was unable to parent the children due to cognitive deficits. For the State to prove a parent unfit for being unable to discharge parental responsibilities, it must present evidence from a psychiatrist, licensed clinical social worker, or clinical psychologist that the parent has a mental impairment, mental illness, or intellectual disability, and that it is likely that the inability to discharge parental responsibilities will extend beyond a reasonable period. 750 ILCS 50/1(D)(p) (West 2020); see also *In re Michael M.*, 364 Ill. App. 3d 598, 608 (2006). Frey said that, after giving respondent several diagnostic tests, she was concerned about her decision-making. She was also concerned with her ability to bond with the children after being absent from their lives for such a long time. She also opined that respondent's cognitive issues were not remediable and thus there was no reason to think that her inability to discharge parental responsibilities could be resolved within a reasonable time.

¶ 37 Counsel notes a potential tension between the findings that respondent failed to show a reasonable degree of interest, concern, or responsibility and that she was unable to discharge parental duties due to cognitive deficits. Given that a court must evaluate a parent's *efforts* in light of the relevant circumstances (*Syck*, 138 Ill. 2d at 278-79), it could be argued that Frey's testimony

9

supports a conclusion that her failures were the result of her limited intellectual functioning rather than a lack of interest in or concern for the children. Counsel further notes, however, that, because the State need only prove one ground of unfitness, an argument that a finding of unfitness on one of multiple grounds was erroneous would not require reversal of the court's order. We agree.

¶ 38    In any event, the court's findings are not inconsistent. Frey's testimony focused on respondent's decision-making and her ability to protect the children. King's testimony, on the other hand, focused primarily on respondent's failure to communicate with or even ask about the children. Frey never testified that respondent would have difficulty communicating with the children at some level. Thus, the court could reasonably find that respondent failed to maintain a reasonable degree of interest, concern, or responsibility for the minors even in light of her limited intellectual capacity.

¶ 39    Counsel also concludes that there is no reasonably meritorious argument that the court erred in terminating respondent's parental rights. After a finding of unfitness, the case proceeds to a hearing on the children's best interests. At this stage of the proceedings, a parent's interest in maintaining the parent-child relationship must yield to the child's need to live in a stable, permanent, loving home. *In re D.T.*, 212 Ill. 2d 347, 364 (2004). To successfully terminate a parent's rights, the State must prove by a preponderance of the evidence that it is in the child's best interests to do so. *Id.* at 365. On appeal, we must decide whether the court's decision is against the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 53.

¶ 40    Here, Katherine W., the girls' foster mother, is also their aunt. They had resided with her for two years and had previously lived with her for a similar period. The girls were bonded to her and to the other children in the home. Katherine loved the girls and was committed to adopting them if respondent's rights were terminated.

¶ 41    Toni W., the boys' foster mother, testified that she had been the foster parent for them when they were two and three years old, and again since they had come into care this time. They had essentially always lived with her family, only occasionally returning to see their father. She described her efforts to provide stability for the boys, and how she ensured they took advantage of the special education services offered to them, and that she was committed to continuing to do so. The boys were bonded to her, and her husband, and their biological children. She recognized the strong bond the boys had with their father, and she and her husband encouraged the boys to love their father even though they could not then have a relationship with him. She was committed to adopting the boys and knew they loved her and her husband as well.

¶ 42    King testified that she visits all of the children in their foster homes at least monthly. She described Christina and Athena's relationship with their foster mother as "if they were born to her" and their bond as a strong one. Both sets of foster parents tended to the children's medical and mental health needs. The foster parents maintained contact between the children, who have phone contact with each other, and see each other when they can. She had no reservations in opining that it was in the children's best interests that they be adopted by their respective foster parents. In light of this evidence, the court's finding that the children's best interests required terminating respondent's parental rights to allow for their adoption was not against the manifest weight of the evidence.

¶ 43                                    CONCLUSION

¶ 44    As this appeal presents no issue of arguable merit, we grant appointed counsel leave to withdraw and affirm the circuit court's judgment.

¶ 45    Motion granted; judgment affirmed.