NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 240609-U

NOS. 4-24-0609, 4-24-0610, 4-24-0611 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 12, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* Lil. T., Lia. T., and A.L., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Peoria County |
|      Petitioner-Appellee, | ) | Nos. 19JA257 |
|      v. | ) |     19JA258 |
| Heather T., | ) |     21JA64 |
|      Respondent-Appellant). | ) | |
| | ) | Honorable |
| | ) | David A. Brown, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Cavanagh and Justice Harris concurred in the judgment.

**ORDER**

¶ 1 *Held*: The appellate court granted appellate counsel's motion to withdraw and affirmed the trial court's judgment terminating respondent's parental rights, concluding no meritorious issues could be raised on appeal.

¶ 2   On March 5, 2024, the trial court entered an order terminating the parental rights of respondent, Heather T., to her minor children, Lil. T. (born November 2014), Lia. T. (born August 2016), and A.L. (born February 2021). Respondent appealed, and counsel was appointed to represent her. Counsel now moves to withdraw, citing *Anders v. California*, 386 U.S. 738 (1967), on the basis that she cannot raise any potentially meritorious argument on appeal. The record indicates counsel sent a copy of her motion and accompanying memorandum of law to respondent by e-mail. Respondent has not filed a response. After reviewing the record and counsel's memorandum, we grant the motion to withdraw and affirm the court's judgment.

¶ 3                                I. BACKGROUND

¶ 4            On August 13, 2019, the State filed petitions seeking to adjudicate Lil. T. and Lia. T. neglected under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2018)). As to respondent, the State alleged Lil. T. and Lia. T. were neglected due to being in an environment injurious to their welfare. The minors' father, William T., filed for an order of protection alleging respondent had the minors around her paramour, who was a sex offender. When officers arrived at the home to remove the minors from her custody, respondent threatened William and her own mother, pushed a police officer, and resisted arrest. The petition also alleged the environment was injurious to the minors' welfare in that (1) William was found unfit in a prior juvenile case and had not been restored to fitness and (2) William had a criminal history, including convictions for endangering the life or health of a child and domestic battery (705 ILCS 405/2-3(1)(b) (West 2018)). Following a shelter care hearing, the trial court found there was probable cause to believe Lil. T. and Lia. T. were neglected and placed temporary guardianship and custody with the Illinois Department of Children and Family Services (DCFS).

¶ 5            On October 16, 2019, the trial court adjudicated Lil. T. and Lia. T. neglected pursuant to respondent's stipulation to the neglect petitions. On December 11, 2019, the court entered a dispositional order, finding respondent unfit, for reasons other than financial circumstances alone, to care for Lil. T. and Lia. T. The court then made them wards of the court, and continued their guardianship and custody with DCFS, with the right to place.

¶ 6            Respondent gave birth to A.L. on February 2, 2021. On February 8, 2021, the State filed a petition seeking to adjudicate A.L. neglected. The State alleged A.L. was neglected due to being in an environment injurious to his welfare in that (1) respondent was found unfit in Lil. T.'s and Lia. T.'s cases and had not been restored to fitness, (2) respondent was indicated by

DCFS for substantial risk of physical injury/environment injurious to health and welfare and had been convicted of resisting a peace officer, and (3) A.L.'s father, Todd L., had a criminal history, including convictions for robbery (705 ILCS 405/2-3(1)(b) (West 2020)). On April 28, 2021, the trial court adjudicated A.L. neglected. The same day, the court entered a dispositional order, finding respondent unfit and unwilling, for reasons other than financial circumstances alone, to care for A.L. The court then made him a ward of the court, and continued his guardianship and custody with DCFS, with the right to place.

¶ 7            On February 11, 2022, the State filed petitions seeking to terminate respondent's parental rights as to all three minors. The State alleged respondent was an unfit parent in that she failed to make reasonable progress toward the return of the minors to her care during a nine-month period following the adjudication of neglect, namely the period of May 9, 2021, to February 9, 2022 (750 ILCS 50/1(D)(m)(ii) (West 2022)).

¶ 8                                        A. Fitness Hearing

¶ 9            The trial court began the fitness hearing on January 18, 2024. The court admitted respondent's drug drop and counseling records into evidence.

¶ 10                                        1. *Brooke Bowton*

¶ 11           Brooke Bowton testified she was the caseworker during the relevant period. Bowton had "quite a difficult time communicating" with respondent. When Bowton would call to discuss services, respondent "would become very upset and very threatening towards [her] at some times." Bowton explained, "Anytime I had any kind of communication with [respondent] it would go into blaming a previous caseworker or blaming me, calling me pathetic, lazy, just very—very defensive, very argumentative, which either led her to hang up on me or I would have to end the phone call."

¶ 12        Bowton acknowledged respondent completed domestic violence services during the relevant period. However, Bowton was concerned about respondent maintaining a relationship with Todd, despite her "knowing that he has a pretty significant history of being violent." In November 2021, respondent was around William again and witnessed him using substances. Bowton described this as "a huge concern because this case came into care because of people that were around the [minors] and [respondent's] actions."

¶ 13        Respondent attended individual counseling during the relevant period, and Bowton acknowledged "there would be a couple of times that [she] would do really well." Respondent raised issues she had with Bowton during counseling, and respondent's therapist invited respondent and Bowton to attend a session together. However, respondent did not want Bowton to attend. Respondent was not successfully discharged from counseling before the end of the relevant period, despite her therapist "willing to go out of her way" to continue treating her after missed appointments. Respondent was also required to complete drug drops twice a month, but she only completed one drop—in January 2022—due to having a "very busy schedule" and not being "able to go."

¶ 14        Respondent only attended one visit during the relevant period (on July 16, 2021). During this visit, Bowton began discussing drug drops with respondent. Respondent, who was "swinging her body around" while holding A.L., "became very, very upset," called Bowton "a b***," and "stormed out." Bowton was not able to schedule more visitation for respondent until after the relevant period, as respondent did not provide her work schedule until December 2021.

¶ 15        Bowton did not feel it was safe to return the minors to respondent at the end of the relevant period. Bowton explained:

"A lot of her anger, the—directing it towards me was very concerning. Also that she really never took any ownership of anything that she missed. It was either the previous caseworker's fault, it was my fault, it was somebody else's fault[.]

\*\*\*

And so the concerns that I would have is, you know, that she—she definitely has significant anger issues that she needs to address, but also she didn't complete any drug drops and, you know, that's a service that she needed to participate in. And I think that's an important service to do."

¶ 16    On cross-examination, Bowton acknowledged respondent had "relatively stable" housing and two jobs during the relevant period.

¶ 17                                    2. *Respondent*

¶ 18    Respondent testified she completed both parenting and domestic violence services. Respondent "would have been" willing to participate in a counseling session with Bowton, but this did not occur because her therapist "had a really hard time being able to get a hold of [Bowton]." According to respondent, she discovered William using substances when she visited him on Thanksgiving in 2021 after he contacted her and told her he was lonely. Respondent observed William smoking crack cocaine when she arrived and informed Bowton "right away." Respondent denied prior knowledge of William's drug use. Respondent acknowledged attending the visit in July 2021 and claimed to have "eight" or "nine" visits thereafter at the restaurant she worked at. Respondent believed the visits went "really well." Respondent denied any use of illegal substances during the relevant period. Respondent explained she did not do her drug drops due to issues with transportation and the agency no

longer providing her with bus passes after Bowton became her caseworker. Respondent stated, "If I was out and about, I would try to stop in" to complete drug drops.

¶ 19                                 3. *Unfitness Findings*

¶ 20          The trial court delivered its unfitness findings on February 15, 2024. The court found respondent's testimony was "not reliable" and found Bowton's testimony "much more credible and compelling." The court continued:

> "I'd say this. At no point in time during the relevant nine month period was [respondent] granted unsupervised visits or increase of visits that would suggest an imminent return home to her care, and there was a continued antagonism between [respondent] and the caseworker.
>
> And while she was engaged in services and throughout the nine month period of time and completed some of those either prior to or during the relevant nine month period of time, there was no apparent effect on the way she parented, the way she conducted herself, or her lifestyle in general.
>
> ***
>
> She did not complete the drug drops as ordered. She showed a lack of emotional control. The agency had concerns for her anger issues, not taking her responsibilities, as I indicated before, not doing her drops.
>
> * * *
>
> I'd also say that the counseling records show inconsistent appointments or making of appointments, and most if not all of the counseling reports suggest that [respondent] was making minimal or at best moderate progress during the relevant nine month period of time."

The court noted that as of the end of the relevant period, "we're much further away" from returning the minors to respondent. The court found the State proved by clear and convincing evidence respondent failed to make reasonable progress toward the return of the minors to her care during the relevant period.

¶ 21                                    B. Best Interest Hearing

¶ 22            The trial court conducted the best interest hearing on February 29, 2024.

¶ 23                                    1. *Mindy Fischer*

¶ 24            DCFS caseworker Mindy Fischer testified Lil. T. and Lia. T. had been in their foster home together since October 2022. Fischer visited them once a month. Lil. T. and Lia. T. had adequate food and clothing in their foster home. Lil. T. shared a bedroom with one of her foster siblings and Lia. T. had his own bedroom. The minors' foster parents had them very involved in their church. Both minors were enrolled in school. Lil. T. was autistic, but her autism had "greatly improved," to the point that she was "verbal now." Lil. T. saw a counselor at school and a therapist outside of school. Lia. T. had "bad teeth," but his foster parents established dental care for him. Consequently, Lia. T.'s "teeth [were] improving." Lil. T. and Lia. T. were both "very bonded with their foster parents" and felt "very comfortable" in their foster home. Due to her autism, Lil. T. would not express her feelings about respondent. Lia. T. had stated he did not want to have visits with respondent, but this was because he did not want to make the long trip and "[felt] like he misses things because he's gone so long." Lia. T. did not ask Fischer about respondent, but the foster parents reported he would "occasionally" say "out of the blue" that he wanted to see her. Lia. T. would ask sometimes, "twice a week and then maybe not at all for two or three months and then it will pop up again." The foster parents were committed to providing

permanency for Lil. T. and Lia. T., and Fischer felt it was in their best interest to be adopted by the foster parents.

¶ 25　　　　A.L. was in a separate foster home. Fischer visited A.L. once a month. A.L. was "very bonded" with his two foster siblings. A.L. had adequate food and clothing in his foster home. A.L. was in daycare, and Fischer referred A.L. to play therapy after one of his foster parents recommended it. Because that service was full, A.L. was being screened for other potential services. A.L.'s foster parents took him on trips with extended family members. A.L. was "very bonded with his foster parents." Fischer noticed, "during visits if we're talking in the kitchen and dad leaves the room, [A.L.] needs to go see where dad went, or if dad takes the dog out, he needs to follow dad to see where dad went or vice versa if mom leaves the area." A.L.'s foster parents wanted to adopt him, and Fischer felt it was in A.L.'s best interest to be adopted by his foster parents.

¶ 26　　　　On cross-examination, Fischer acknowledged respondent provided clothing for all three of the minors and shoes for at least Lia. T. Respondent also acted appropriately with the minors at visits.

¶ 27　　　　　　　　　　　　　2. *Respondent*

¶ 28　　　　Respondent testified Lil. T. "has never lost her bond" with her. Lil. T. "hugs all over [respondent] during every visit" and "definitely likes to kiss [her] on the cheek." Respondent previously worked as a "direct support professional" for people with developmental disabilities and felt she was able to care for Lil. T.'s needs relating to her autism. Respondent said there was affection between her and Lia. T. during visits. When asked about whether Lia. T. does not want to see her after a long trip to the visits, respondent answered, "The kids actually complain about the fact that they have to go home afterwards. They've never, even at the

beginning of the case, they never were mad that they had to miss out on anything. They've always wanted to be at the visits." Respondent felt she could provide for all three minors and was "more ready now" for them to return than she has "ever been." Respondent felt she "definitely" could take better care of Lil. T.'s and Lia. T.'s medical needs than their foster parents. When asked why, respondent explained:

> "Every single visit just for the last year alone I have brought all these basic necessities to the visits not because I was, you know, nitpicking. It was because these were needs and things that my kids needed that wasn't [*sic*] being provided, so I had to take it upon myself to keep providing for them at every visit and still try to not make the visits about that, you know, have the kids change, help brush their hair, you know, basic things."

When asked to explain why she felt terminating her parental rights would not be in the minors' best interest, respondent answered:

> "Everybody makes mistakes. Everybody—every parent makes mistakes all the time, and I don't feel like I should be punished for the rest of my life, and I feel like my kids deserve to have a mom that tries, tries again, tries for them, fights for them. I am the only parent almost five years later that is still standing in this courtroom, and I think that speaks a lot of volume."

¶ 29                                   3. *Best Interest Findings*

¶ 30          The trial court first expressed concern with how respondent "doesn't seem to accept responsibility. As a matter of fact, much of her testimony is trying to deflect onto somebody else." The court noted respondent "remains unfit, and *** it's not entirely clear to the

Court that she would regain her fitness at any time in the near future." The court stated Lia. T. was "pretty clear" on his desire to live with respondent—as reflected in the guardian *ad litem*'s oral representation during the hearing—and gave this "a fair amount of weight."

¶ 31 The trial court acknowledged the need to consider the statutory best interest factors and stated it had "the list" in front of it, even if it did not "specifically mention one." The court found "all three of the [minors'] physical safety and welfare have been provided *** predominately by the foster parents, throughout the period of these cases." Next, the court found the minors' "identities are, have been, and continue to form substantially with the foster parents." The court continued:

"The [minors'] backgrounds and ties, familial, cultural, and religious, they've all been developing with the foster parents, primarily the sense of attachment, where they feel loved, a sense of feeling valued.

I think it's—it sounds to me like when they have time with [respondent], and it's limited time under these circumstances, the [minors] enjoy that, but the vast majority of their time is spent in foster care and substitute care, and so with regard to [Lia. T.], I'd find that to be a neutral factor, and with [A.L.] and [Lil. T.], it would favor termination.

A sense of security and familiarity certainly with the foster parents for all three of the [minors]. Continuity of affection, once again, with all three of the [minors]. Least disruptive placement, all three of the [minors], those factors would favor termination.

[The minors'] wishes, I mentioned that already. I do give [Lia. T.'s] preference a considerable weight. Community ties including school, church,

and friends have all developed for these [minors] with the substitute care of foster placements.

Their need for permanence only becomes more intense as these cases become further and further into the months and years and there's a substantial need for permanency. ***

\* \* \*

But in any event, factoring all of the statutory factors and weighing them, I do find that they weigh in favor of terminating the parental rights of [respondent]. Each one of these children need permanence. They deserve permanence.

[Respondent] has been given ample time, and has so far been unable to achieve her fitness, and these [minors] need to have a clear vision of where their future lies, and so, I find that the State has proven by a preponderance of the evidence the petitions with each one of these [minors], and the Court will order [respondent's] parental rights be terminated."

¶ 32    This appeal followed.

¶ 33                                    II. ANALYSIS

¶ 34    On appeal, counsel seeks to withdraw on the basis that she cannot raise any arguments of potential merit.

¶ 35    The procedure for appellate counsel to withdraw set forth in *Anders* applies to findings of parental unfitness and termination of parental rights. *In re S.M.*, 314 Ill. App. 3d 682, 685 (2000). According to this procedure, counsel's request to withdraw must "be accompanied by a brief referring to anything in the record that might arguably support the appeal." *Anders*,

386 U.S. at 744. Counsel must "(a) sketch the argument in support of the issues that could conceivably be raised on appeal, and then (b) explain why [s]he believes the arguments are frivolous." *S.M.*, 314 Ill. App. 3d at 685. Counsel must then conclude the case presents no viable grounds for appeal. *S.M.*, 314 Ill. App. 3d at 685. In doing so, counsel should review both the unfitness finding and the best interest determination and indicate in the brief that she has done so. *S.M.*, 314 Ill. App. 3d at 685-86.

¶ 36    In the instant case, counsel asserts she has reviewed the record on appeal, including the report of proceedings of the termination hearings, and has concluded there are no appealable issues of merit. Counsel states she has considered raising two arguments: (1) the trial court erred in finding respondent unfit during the relevant period and (2) the court erred in finding it was in the minors' best interest to terminate respondent's parental rights. We address each argument in turn and ultimately agree with counsel's conclusion that there are no issues of arguable merit to be raised on appeal.

¶ 37                              A. Unfitness Findings

¶ 38    We first address counsel's assertion no meritorious argument can be made that the trial court erred in finding respondent failed to make reasonable progress during the relevant period.

¶ 39    Termination of parental rights under the Juvenile Court Act is a two-step process. *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 63. Parental rights may not be terminated without the parent's consent unless the trial court first determines, by clear and convincing evidence, the parent is unfit as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). A parent may be found unfit if he or she fails to "make reasonable progress toward the return of the child to the parent during any 9-month period

following the adjudication of neglected *** minor." 750 ILCS 50/1(D)(m)(ii) (West 2022). A "parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care during any 9-month period following the adjudication" constitutes a failure to make reasonable progress for purposes of section 1(D)(m)(ii). 750 ILCS 50/1(D)(m)(ii) (West 2022).

¶ 40        We will not disturb a finding of unfitness unless it is against the manifest weight of the evidence. *In re J.H.*, 2020 IL App (4th) 200150, ¶ 68. "A finding is against the manifest weight of the evidence only if the evidence calls for the opposite finding [citation], such that no reasonable person could arrive at the circuit court's finding on the basis of the evidence in the record." (Internal quotation marks omitted.) *J.H.*, 2020 IL App (4th) 200150, ¶ 68. "This court pays great deference to a trial court's fitness finding because of [that court's] superior opportunity to observe the witnesses and evaluate their credibility." (Internal quotation marks omitted.) *In re O.B.*, 2022 IL App (4th) 220419, ¶ 29.

¶ 41        Here, the State proved by clear and convincing evidence respondent failed to make reasonable progress toward the return of the minors during the relevant period. Respondent was required to engage in individual counseling, parenting classes, and domestic violence classes. Respondent completed parenting classes and domestic violence classes either before or during the relevant period, but she did not complete individual counseling during this period. While respondent later completed this service, "[t]his court has held that when making a determination *** [of] reasonable progress, the court may not consider any evidence beyond the statutorily prescribed nine months from the date of the adjudication of neglect." *In re Brianna B.*, 334 Ill. App. 3d 651, 656 (2002). Additionally, respondent was required to complete two random

- 13 -

drug drops per month. However, respondent only completed one drug drop during the relevant period and testified she would "try" to do them if she was "out and about."

¶ 42    Moreover, this court has observed:

"[T]here is a significant difference between going through the motions, checking off the boxes, and mechanically doing what is asked of the parent, and actually changing the circumstances that brought the children into care. The point of requiring parents to attend classes and engage in services is not just so the parents can say they attended; it is so parents *apply* what they learn in their lives, in the real world, such that the court can be confident that the children will be safe in their care." (Emphasis in original and internal quotation marks omitted.). *In re Dar. H.*, 2023 IL App (4th) 230509, ¶ 59.

¶ 43    Respondent's counseling records for the relevant period supported the concerns of both the caseworker and the trial court regarding respondent's anger issues and inability to accept responsibility for the minors coming into care, both of which worsened during this period. The counseling report stated respondent "reported she had been having issues managing her emotions and had outbursts at professionals involved in her case." By the end of the relevant period, respondent's counseling report stated she was "verbally abusive" with professionals "when issues were brought to her attention." Further, respondent "struggled with taking responsibility for *** the issues happening with visits with her children and her services."

¶ 44    In sum, during the relevant period, respondent only completed one drug drop and had not yet completed her individual counseling. Respondent did not adequately address her ongoing issues with anger and accepting responsibility for the minors coming into care. While

respondent attended counseling during the relevant period, her records reflect she was not able to meaningfully apply whatever skills she was learning to her parenting such that the trial court could be confident the minors would be safe with her. Respondent did not "substantially fulfill *** her obligations under the service plan" and therefore did not make reasonable progress toward the minors' return. 750 ILCS 50/1(D)(m)(ii) (West 2022). As this evidence does not clearly call for the opposite finding, we agree with counsel no meritorious argument can be made that the trial court's finding was against the manifest weight of the evidence.

¶ 45                                    B. Best Interest Findings

¶ 46        Counsel also determined she can make no meritorious argument that the trial court's best interest finding was against the manifest weight of the evidence.

¶ 47        When a trial court finds a parent unfit, "the court then determines whether it is in the best interests of the minor that parental rights be terminated." *In re D.T.*, 212 Ill. 2d 347, 352 (2004). "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. The State must prove by a preponderance of the evidence that termination of parental rights is in the minor's best interest. *D.T.*, 212 Ill. 2d at 366. In making the best interest determination, the court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2022)). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community

ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009) (citing 705 ILCS 405/1-3(4.05) (West 2008)).

"The court's best interest determination [need not] contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. On review, "[w]e will not disturb a court's finding that termination is in the children's best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005).

¶ 48        Here, the trial court's best interest finding was not against the manifest weight of the evidence. Lil. T. and Lia. T. had been together in the same foster home since October 2022. Their foster parents were providing them with adequate food and clothing. They were both enrolled in school and very involved in their church. Through the services Lil. T. was receiving both in and out of school, her autism had greatly improved and she became verbal. Due to his foster parents establishing dental care for him, Lia. T.'s dental issues were improving. Lil. T. and Lia. T. were both "very bonded with their foster parents" and felt "very comfortable" in their foster home. Lia. T. did not want to have visits with respondent because he did not want to make the long trip and "[felt] like he misses things because he's gone so long." The foster parents reported Lia. T. going months at a time without expressing an interest in seeing respondent. Their foster parents were committed to providing permanency for them. As for A.L., who lived in a separate foster home, he was "very bonded" with his two foster siblings and foster parents.

Fischer testified A.L. would leave her during visits to follow his foster parents around the house. A.L.'s foster parents had him enrolled in daycare and recommended Fischer arrange play therapy for him. A.L.'s foster parents provided him with adequate food and clothing, took him on trips with extended family members, and wanted to adopt him. As the court noted, respondent was unfit, and it was not clear she would regain fitness in the near future. Meanwhile, all three minors needed permanence and a "clear vision of where their future lies," and this need was becoming "more intense" the longer their cases continued.

¶ 49      Based on our review of the record on appeal, we agree with counsel no meritorious argument can be made that the trial court's best interest determination was against the manifest weight of the evidence.

¶ 50                        III. CONCLUSION

¶ 51      For the reasons stated, we grant counsel's motion to withdraw and affirm the trial court's judgment.

¶ 52      Affirmed.