NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 251085-U

NOS. 4-25-1085, 4-25-1086 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 18, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* Gre. B., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McDonough County |
|       Petitioner-Appellee, | ) | Nos. 16JA26 |
|       v.      (No. 4-25-1085) | ) |     16JA30 |
| Robyn B., | ) | |
|       Respondent-Appellant). | ) | |
| | ) | |
| | ) | |
| ———————————————————————— | ) | |
| | ) | |
| *In re* Gra. B., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
|       Petitioner-Appellee, | ) | |
|       v.      (No. 4-25-1086) | ) | Honorable |
| Robyn B., | ) | Heidi A. Benson, |
|       Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Justices DeArmond and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, concluding the trial court's determination that
          respondent was unfit and it was in the best interest of her two youngest children to
          terminate her parental rights was not against the manifest weight of the evidence.

¶ 2          On September 19, 2025, the trial court entered an order terminating the parental

rights of respondent, Robyn B., to two of her minor children, Gre. B. (born in October 2014) and

Gra. B. (born in December 2016). Respondent appeals, arguing the court erred in finding she was

unfit and in finding the termination of her parental rights was in the best interest of the minors.

We affirm.

¶ 3                                     I. BACKGROUND

¶ 4            On November 4, 2016, the State filed a petition seeking to adjudicate Gre. B. neglected under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2016)). The petition alleged Gre. B. was neglected because her environment was injurious to her welfare. It alleged she was neglected due to the amount of garbage, dirt, food, and trash contained throughout the home and, despite several months of intact services put in place after reports of environmental neglect to the Illinois Department of Children and Family Services (DCFS), respondent was unable to maintain a clean and healthy living environment for Gre. B. Thereafter, on December 27, 2016, after the birth of Gra. B., the State filed a petition seeking to also adjudicate Gra. B. neglected under section 2-3(1)(b) of the Juvenile Court Act based on the same allegations. Similar petitions were filed with respect to Gre. B. and Gra. B.'s four older siblings, T.B., H.B., A.B., and M.B. Respondent stipulated to the facts in the petitions, and all six minors were adjudicated neglected.

¶ 5            A combined dispositional and shelter care hearing was held on February 9, 2017. The trial court found probable cause to find the minors were neglected based on lack of medical attention and lack of education. Guardianship and custody of four of the minors, including Gre. B., was placed with DCFS. Based upon the recommendation of the State, custody of Gra. B., who was an infant, and M.B., who was medically complex, remained with respondent. However, on June 15, 2017, custody of Gra. B. and M.B. was also granted to DCFS because of concerns for their health, safety, and welfare.

¶ 6            On August 14, 2019, the State filed petitions to terminate respondent's parental rights as to Gre. B. and Gra. B. The petitions alleged respondent was unfit because she

substantially neglected the minors continuously or repeatedly (750 ILCS 50/1(D)(d) (West 2018)); failed to protect the minors from conditions in their environment injurious to their welfare (*id.* § 1(D)(g)); caused other neglect of the minors (*id.* § 1(D)(h)); and failed to make reasonable progress toward the return of the minors during the nine-month period of November 6, 2018, through August 6, 2019 (*id.* § 1(D)(m)(ii)). The petitions also sought to terminate the parental rights of the minors' father, who was incarcerated. Following the filing of the petitions to terminate both parents' parental rights, the permanency goal for Gre. B. and Gra. B. was changed on October 10, 2019, from return home within 12 months to substitute care pending a court determination on the termination of parental rights. That remained the permanency goal for Gre. B. and Gra. B. during the pendency of the case. In several of the subsequent permanency review hearing orders, the trial court stated this goal was appropriate because of the age of the minors, their length of time in placement, and the progress of the parents in services.

¶ 7           On March 6, 2025, the Stated filed amended petitions to terminate respondent's parental rights as to Gre. B. and Gra. B. The amended petitions alleged respondent was unfit for failing to make reasonable progress toward the return of the minors during the period from February 1, 2024, through November 1, 2024 (750 ILCS 50/1(D)(m)(ii) (West 2024)). The State also filed petitions to terminate the parental rights of the father of Gre. B. and Gra. B., but he passed away prior to the fitness hearing.

¶ 8                              A. The Fitness Hearing

¶ 9           The fitness hearing occurred on May 29, 2025. Juan Perales testified he was a child welfare specialist for Chaddock Foster and Adoption Services (Chaddock), and he was the caseworker for respondent from April 2023 until March 2025. When the case was transferred to him in 2023, it had been pending for several years. To familiarize himself with the case, Perales

reviewed the case history and met with the various parties, including respondent, the minors, and the foster parents. Perales testified the minors were originally taken into custody due to environmental neglect and medical neglect. During the relevant time frame of February 1, 2024, through November 1, 2024, Perales prepared two service plans. The service plans outlined the services necessary for the family, including respondent, to complete to remedy the problems that brought the minors into DCFS custody. He identified the first service plan, dated February 14, 2024, and the second service plan, dated August 19, 2024, and both were admitted as exhibits. The service plans required respondent to (1) cooperate with DCFS; (2) work on her parenting skills and be consistent with visitation; (3) participate in mental health and domestic violence counseling; and (4) provide a safe, adequate, and clean house and environment.

¶ 10    Perales testified that respondent was cooperative. She was consistent with visitation and would bring food and snacks for the minors. Respondent was generally appropriate in her interactions with the minors during visits, but there were a few instances where she struggled to discipline appropriately. Also, she had completed the required services for domestic violence counseling. However, respondent had not successfully completed the required mental health services, and she ceased participating in mental health counseling after December 2023. Perales did not receive any documentation of mental health services provided during the entire relevant time frame. Perales testified he reminded respondent several times that she needed to reengage in mental health services and he advised respondent she could apply for "flex funding" for financial assistance for that service. Respondent never requested financial assistance. With respect to her housing and the environment for the minors, Perales testified respondent lived in a studio apartment with her teenage daughter, A.B., and respondent's two older sons also stayed overnight at times. The apartment was sanitary, with running water and sufficient food.

However, the apartment was not adequate or appropriate for two additional, and younger, children. Perales expressed his concern to respondent several times, but she did not take steps to improve her housing situation.

¶ 11    The State requested the trial court take judicial notice of a list of documents. The list included the petition for adjudication, filed on November 4, 2016; the adjudicatory order dated January 12, 2017; the temporary custody order and dispositional order, both dated February 9, 2017; and permanency review hearing orders dated May 2, 2024, July 18, 2024, October 24, 2024, and March 6, 2025. The May 2, 2024, permanency review hearing order stated the appropriate permanency goal for Gre. B. and Gra. B. remained substitute care pending a court determination on termination of parental rights because of the age of minors, the length of time in placement, and the progress of the parents in services. Respondent had not made reasonable efforts or progress toward the return home of Gre. B. and Gra. B. The July 18, 2024, permanency review hearing order further stated respondent needed a new living situation and better parenting skills. The order acknowledged respondent had made efforts toward the return home of Gre. B. and Gra. B. but not reasonable progress. The court took judicial notice of the petitions for adjudication and its prior orders.

¶ 12    Respondent moved for a directed verdict. In response, the State acknowledged respondent had made efforts, which explained the nine-year history of the case. However, the State argued respondent had not made reasonable progress. Gre. B. and Gra. B. were no closer to returning to respondent's home than when the case started. The trial court denied respondent's motion.

¶ 13    Respondent testified she was employed during the relevant time frame. At the time of the hearing, she and A.B. resided in a studio apartment. Respondent could not afford a

larger apartment, but she had applied for public housing in November or December 2022 and was on a waiting list. She had also requested a case transfer to Iowa, where she had family, but the transfer had not been approved. In the studio apartment, respondent had hung up a curtain to create a bedroom, which contained bunk beds, where she and A.B. slept. There was a dresser for their clothing. In the main area of the studio apartment, there was twin bed, which also functioned as a couch. There were foldable mattresses under each bed, and respondent's two older sons would sleep on those mattresses or the twin bed when they visited overnight.

¶ 14    Respondent testified she had moved to Iowa during the pendency of the case, and she was seeing a counselor in Iowa. After she moved back to Illinois, the counselor in Iowa was not covered by Illinois public aid. Respondent could not recall how many times she met with her counselor during the relevant time frame, but she testified she stopped attending counseling at some point in the spring of 2024. Respondent testified Perales did not offer any financial assistance in setting up mental health counseling services in Illinois and Perales indicated "he was not worried about it," so she did not make it a priority. As of the date of the fitness hearing, in May 2025, respondent was reengaged in mental health counseling. Respondent could not recall if she received a written assessment from her counselor in Iowa. However, she testified there was a written assessment of her mental health when the case was first opened, which diagnosed her with complex posttraumatic stress disorder, generalized anxiety disorder, and bulimia.

¶ 15    The trial court concluded the State proved by clear and convincing evidence respondent was unfit for failing to make reasonable progress toward the return home of Gre. B. and Gra. B. during the nine months from February 1, 2024, through November 1, 2024. In reaching its decision, the court considered the testimony and exhibits admitted at the hearing,

along with the documents of which it took judicial notice. The court acknowledged A.B. had been returned to respondent's care, but Gre. B. and Gra. B. were younger children, and they required a different level of care. The minors came into care because of chaos in the home and a lack of medical attention and education for the minors. The court acknowledged respondent's efforts and love for Gre. B. and Gra. B. but found she was overwhelmed and could not care for them. The court credited Perales's testimony that respondent had not been participating in any mental health counseling during the relevant time frame. After considering the combination of the inadequate housing, lack of mental health counseling, and age of the minors, the court found by clear and convincing evidence that the State could not return Gre. B. and Gra. B. to respondent's care in the near future. Thus, the State's petition citing lack of reasonable progress during the relevant time frame was proven.

¶ 16                                   B. The Best-Interest Hearing

¶ 17            The best-interest hearing took place on September 18, 2025. Marissa Fast testified she was a caseworker at Chaddock, and she had been the caseworker for respondent since March 2025. When Fast took over the case, she reviewed the case file and met with respondent, the minors, and the foster parents. Fast testified Gre. B. and Gra. B were currently placed with the same foster parents. Gra. B., who was 8 years old, was placed with the foster parents on June 15, 2017, and Gre. B., who was 10 years old, was placed with them on September 10, 2019. Fast had visited the foster home once a month since March 2025, and she testified the minors' needs for physical safety, including food, shelter, and clothing, were being met by the foster parents. Based on her observations of the minors in the foster home, Fast believed the minors felt secure and their needs for affection were being met. She observed the foster parents treating the minors like they were their daughters. The minors called the foster parents "mom and dad." Gra. B. had

resided with the foster parents for all but the first six months of her life. Gre. B. had been in foster care since she was two years old, and she had resided with the foster parents for the last six years. Both minors had attachments to the community. They attended school in that community and participated in activities like swimming, dance, gymnastics, and volleyball.

¶ 18 Delaney Abbott, a therapist at Chaddock, testified she started therapy sessions with Gre. B. and Gra. B. in May 2025. Abbott did testing and assessments of both minors. Both scored within normal limits for all categories, except Gre. B. tested within the at-risk range for the category of inattention and hyperactivity. As Gre. B. did well in school, Abbott did not believe that was a significant finding at that time. Abbott diagnosed both minors with an adjustment disorder, due to the feelings of sadness they expressed from the recent deaths of their biological father and their sister, M.B (the record indicates M.B. passed away in December 2023). However, neither minor had any clinically significant mental health symptoms, and both seemed well-adjusted. Abbott spoke with both minors about not seeing respondent or their other siblings anymore, and the minors reported they were sad the visits ended and agreed it was a big change. Abbott recommended biweekly therapy sessions with both minors to explore and make sense of their life experiences.

¶ 19 Robert C., the foster father of both minors, testified his intention would be to adopt the minors if the situation arose. However, he and his wife would remain committed to the minors and allow them to stay in their home if they remained in the foster care system. Robert denied having any major health issues.

¶ 20 Stacey Hawkins testified she worked for a home health agency and respondent's daughter, M.B., was Hawkins's first client at the home health agency in 2013. Hawkins worked with M.B. for about three years, including following M.B into her foster care placement. M.B.

required extensive, one-on-one care for serious medical issues, including a tracheostomy with ventilator support. After she was no longer caring for M.B., Hawkins maintained a relationship with respondent, which included meeting for lunch and visiting on the telephone. Hawkins observed respondent to be an attentive and loving mother, although she last observed Gre. B. and Gra. B. with respondent when M.B. was still in foster care, which was seven or eight years ago. At that time, Hawkins observed Gre. B. to be affectionate toward respondent, but Gra. B. was just an infant.

¶ 21 A.B. testified she was 14 years old and she was the sister of Gre. B. and Gra. B. She testified Gre. B. and Gra. B. always seemed happy and excited to see respondent and A.B. at visits and they were sad for each visit to end. H.B. testified he was 18 years old and he was the brother of Gre. B. and Gra. B. He reiterated Gre. B. and Gra. B. always seemed happy to see respondent and their siblings at visits.

¶ 22 Anthony Trosley, a priest, testified he met respondent and her children in December 2016. At that time, for a few months, until the children were taken into care, Trosley observed respondent with all her children. He described her as fierce in her love and dedication to her children. Since then, Trosley only saw Gre. B. and Gra. B. on two occasions, the recent funeral of their biological father and the funeral of M.B. On those occasions, Gre. B. and Gra. B. appeared happy to see respondent and their siblings.

¶ 23 Respondent testified she had consistently attended visitation with Gre. B. and Gra. B. for the nine years the case had been open, except for times she had transportation issues. During visits, respondent liked to bring hands-on activities or food because Gre. B. and Gra. B. enjoyed those sorts of interactions. The visits were for four hours once a month. Prior to that, the visits were for two hours a week in respondent's home. Respondent also testified she had some

overnight visits with Gre. B. in 2019, when Gre. B. was in her first foster care placement. At the time of the best-interest hearing, respondent lived in a low-rent two-bedroom apartment, which was approved for four people. She could apply for a larger one. If Gre. B. and Gra. B. were returned to her care, respondent would register them for school and enroll them in similar extracurricular activities. Respondent believed Gre. B. and Gra. B. would suffer some trauma in being removed from their foster parents but that trauma would be less than being removed from her and their biological siblings.

¶ 24    The trial court entered an order finding termination of respondent's parental rights to be in Gre. B. and Gra. B.'s best interest. The court acknowledged Gre. B. and Gra. B. had a bond and a positive relationship with respondent and enjoyed spending time with their biological siblings, but the court focused on permanency. Gre. B. and Gra. B. had been in foster care for most of their lives. Gra. B. had been with the same foster parents since she was six months old. Gre. B. was also very young when she was placed with the same foster parents, so Gre. B. and Gra. B. had one another. The foster parents are the parents who had nurtured and loved them, provided a safe space for them, and enrolled them in enrichment activities. After considering the statutory factors, the court concluded the State met its burden of proving by a preponderance of the evidence that terminating respondent's parental rights was in the best interest of Gre. B. and Gra. B.

¶ 25    This appeal followed.

¶ 26                                    II. ANALYSIS

¶ 27    On appeal, respondent argues the trial court's finding of unfitness and finding it was in Gre. B.'s and Gra. B.'s best interest to terminate her parental rights were against the manifest weight of the evidence.

¶ 28 Initially, we note this is an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Under that rule, this court is required to issue its decision within 150 days after the filing of the notice of appeal unless there has been "good cause shown." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Here, the notice of appeal was filed by respondent in the trial court on October 3, 2025, so our decision was due to be filed by March 2, 2026. Prior to filing an appellate brief, respondent filed a motion to consolidate the appeals of the termination of her parental rights as to Gre. B. and Gra. B. and, subsequently, filed a motion for leave to file her late appellate brief *instanter*. Because of the delay caused by the consolidation motion and subsequently late appellate brief, we find good cause exists to issue our decision after the 150-day deadline.

¶ 29 Turning to the merits of the appeal, the involuntary termination of parental rights involves a two-step process pursuant to section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2024)). First, the State must prove by clear and convincing evidence the parent is an "unfit person" as defined by section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). If a parent is found to be unfit, the State must then prove that terminating parental rights is in the minor's best interest. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31.

¶ 30 A. The Unfitness Finding

¶ 31 Section 1(D)(m)(ii) of the Adoption Act defines an unfit person as a parent who fails "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the [Juvenile Court Act]." 750 ILCS 50/1(D)(m)(ii) (West 2024). Reasonable progress is an objective standard whereby the trial court can conclude the progress being made by the parent is

demonstrable and of such a quality that the court will be able to return the child to parental custody in the near future. *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 51. The benchmark for measuring a parent's reasonable progress includes compliance with service plans and court directives, considering the conditions that gave rise to the removal of the child and any other conditions that later became known that would prevent the return of the child. *Id.* ¶ 50.

¶ 32 Each determination of parental fitness is *sui generis*, requiring a close analysis of the individual facts of the case. *In re O.B.*, 2022 IL App (4th) 220419, ¶ 29. As the fitness finding is fact-specific and the trial court had the opportunity to view and evaluate the testimony and credibility of all witness, this court affords great deference to a trial court's fitness finding. *In re A.L.*, 409 Ill. App. 3d 492, 500 (2011). We will not reverse a finding of unfitness unless it is against the manifest weight of the evidence. *In re J.H.*, 2020 IL App (4th) 200150, ¶ 68. "A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent." *In re Dar. H.*, 2023 IL App (4th) 230509, ¶ 54.

¶ 33 Here, respondent was required to cooperate with DCFS, work on her parenting skills and be consistent with visitation, participate in mental health and domestic violence counseling, and provide suitable housing. During the relevant period, respondent had not secured housing appropriate for the addition of two more children, especially younger children. While respondent was cooperative with DCFS and had completed domestic violence counseling, she was not compliant with the service plan requirement of participating in mental health counseling. The trial court credited Perales's testimony that respondent ceased participating in mental health counseling in December 2023, finding Perales's testimony to be more credible than respondent's testimony that she continued counseling into the spring of 2024. So, the court concluded respondent did not attend mental health counseling at all during the relevant time frame. The

court found that failure to be relevant, especially considering the circumstances of neglect which brought the minors into care and the additional circumstance of respondent's failure to address the unsuitable housing.

¶ 34　　　　Given this evidence, the trial court could have reasonably concluded respondent's progress was not sufficiently demonstrable or of such a quality that the court would be able to return Gre. B. and Gra. B. to respondent's care in the near future. See *Ta. T.*, 2021 IL App (4th) 200658, ¶ 55 ("[T]he trial court's ability to return the children to a parent's care in the near future is the lodestar of whether a parent has made reasonable progress."). As it is not clearly evident the State failed to prove by clear and convincing evidence that respondent was unfit as defined by section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2024)), we conclude the court's finding that respondent failed to make reasonable progress was not against the manifest weight of the evidence.

¶ 35　　　　　　　　　　　B. The Best-Interest Finding

¶ 36　　　　After a trial court finds a parent unfit, the focus shifts from the parent to the child. See *In re D.T.*, 212 Ill. 2d 347, 364 (2004). "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* The State must prove by a preponderance of the evidence termination of parental rights is in the child's best interest. *Id.* at 366. In making the best-interest determination, the court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2024)). The factors to be considered, in the context of the child's age and developmental needs, are:

"(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and

- 13 -

religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009). See 705 ILCS 405/1-3(4.05)(a)-(j) (West 2024).

However, "[t]he court's best interest determination [need not] contain an explicit reference to each of these factors." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 37        On review, "[w]e will not disturb a court's finding that termination is in the children's best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005). As noted above, a decision is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent. *Dar. H.*, 2023 IL App (4th) 230509, ¶ 54.

¶ 38        Here, the trial court focused primarily on permanency and the fact that Gre. B. and Gra. B. had been in foster care for more than eight years. Since they were only 10 years old and 8 years old, respectively, that meant they had been in foster for most of their lives. Gra. B. had been with the same foster parents since she was six months old, and Gre. B. was also very young when she was placed with the same foster parents. Gre. B.'s and Gra. B.'s physical safety and welfare, their identities, and their senses of attachment had been provided for by the foster parents. The foster parents were willing to adopt both Gre. B. and Gra. B. Accordingly, we conclude the court's finding it was in Gre. B. and Gra. B.'s best interest to terminate

respondent's parental rights in each case was not against the manifest weight of the evidence.

¶ 39                                      III. CONCLUSION

¶ 40             For the reasons stated, we affirm the trial court's judgment.

¶ 41             Affirmed.